[L. A. No. 22881. In Bank. Apr. 2, 1954.]

THE PEOPLE, Appellant, v. WESTERN AIR LINES, INC. (a Corporation), Respondent.

Everett C. McKeage and J. Thomason Phelps for Appellant.

Guthrie, Darling & Shattuck, Hugh W. Darling, D. P. Renda, Donald K. Hall and Matthew S. Rae, Jr., for Respondent.

SHENK, J.—This is an appeal from a judgment of dismissal after a demurrer to the complaint had been sustained without leave to amend.

The action was brought to enforce the penalty provisions of section 2107 of the Public Utilities Code. It was brought in the name of the People at the instance of the Public Utilities Commission as authorized by section 2104 of that code. Companion cases are *People* v. *United Air Lines, Inc.,* S. F. No. 18900, *post,* p. 878 [268 P.2d 745], and *People* v. *California Central Air Lines,* L. A. No. 22880, *post,* p. 877 [268 P.2d 744], this day decided.

After setting forth the status of the Public Utilities Commission as a public agency operating under the Constitution and statutes of this state, the complaint proceeds to allege that pursuant to law the commission has at all times had jurisdiction over the rates, fares, charges and tariffs of all transportation companies, common carriers and public utilities operating within this state insofar as their intrastate operations are concerned; that the commission directed its attorney to institute this action; that the defendant is a Delaware corporation having its principal place of business in the county of Los Angeles; that at all times involved the defendant was engaged in the intrastate transportation of passengers by air and furnishes such transportation for compensation to the public generally; that the defendant is a transportation company, a common carrier and a public utility by virtue of and within the contemplation and meaning of article XII of the state Constitution, and of chapter 11 of part 1 of division 1 of the Public Utilities Code, as amended.

The complaint further alleges that on September 1, 1949, the defendant filed with the commission its Local Air Coach Passenger Tariff No. 1, establishing its rates for one-way adult air coach service between Los Angeles and San Francisco, California, at $13.60 and $27.20, one-way and round-trip, respectively; that under date of March 14, 1950, pursuant to investigation and hearing, the commission, by its order No. 43932 (49 Cal.P.U.C. 494) found fares for this service of $9.95 and $19.90, one-way and round-trip, to be reasonable; that on April 14, 1950, the defendant filed its 3d Revised Tariff No. 1 establishing these rates commencing June 1, 1950; that these were the lawful rates for this service until May 9, 1951; that effective May 9, 1951, the commission by its decision No. 45624 (50 Cal.P.U.C. 563) [dated April 24, 1951] authorized the defendant to increase the fares applicable to this service to $11.70 and $23.40, one-way and round-trip, respectively; and that the defendant had increased its rates for this service on March 1, 1951, without prior or any authorization, to $11.70 and $23.40, one-way and round-trip, respectively, and had demanded and received this rate for each of the 69 days thereafter, to and including May 8, 1951.

It is further alleged that by reason of these acts the defendant had incurred a penalty to the People in the sum of $2,000 for each of the 69 days' violation of law, or a total

penalty of $138,000. Judgment was prayed against the defendant in this sum, plus interest, costs of suit, and such other relief as to the court should appear just and proper in the premises.

The decision of the commission of April 24, 1951, No. 45624, was incorporated by reference in the complaint. It is there disclosed that this defendant, the United Air Lines, Inc., and California Central Airlines operated coach flights between the San Francisco Bay and the Los Angeles areas; that they had each made timely application to the commission to have rate increases to $11.70 and $23.40, one-way and round-trip, respectively, for this service approved as of March 1, 1951, but because sufficient data had not been furnished by them to the commission none of the applications had been granted as of that date. On March 6th the commission, on its own motion, ordered an investigation, and hearings were held as to the reasonableness, lawfulness and propriety of the fares of these companies for this San Francisco-Los Angeles air coach service. The carriers there challenged the jurisdiction of the commission to regulate in any respect the business of air transportation companies. Without waiving their objection to the jurisdiction of the commission they offered evidence to support the reasonableness of the increased fare and to show, in extenuation of their action, that the fare increase had been made in response to a request by the chairman of the federal Civil Aeronautics Board, which they believed to be compulsory upon them.

By its decision the commission determined that it had jurisdiction over transportation companies by virtue of sections 20 and 22 of article XII of the state Constitution; that this jurisdiction extended to air transportation companies; that the Civil Aeronautics Act has not purported to extend economic regulation to intrastate transportation of persons or property by air other than mail, and that the state was free to regulate intrastate rates and fares of air carriers to the same extent as it regulates intrastate rates of railroads, trucking and bus companies, and telephone and telegraph utilities. It found that the fare increases in question were justified and would be authorized "for the future" and that reparations should be made to passengers who had paid the excess fare since March 1, 1951. The decision expressly advised the companies that they would thereafter be deemed to be transportation companies, common carriers and public utilities within the meaning of the state Constitution and be subject

to its prohibitions and requirements. It specifically called their attention to the provisions of section 76(a) of the Public Utilities Act, which provided as follows:*

"Any public utility which violates or fails to comply with any provision of the constitution of this state or of this act, or which fails, . . . to obey . . . any order . . . of the commission, in a case in which a penalty has not hereinbefore been provided for such public utility is subject to a penalty of not less than five hundred dollars nor more than two thousand dollars for each and every offense."

The order was made effective as of May 9, 1951, 15 days after its date. Defendant's petition for review was denied by an order of this court on August 2, 1951, without opinion. A petition for rehearing was denied August 30, 1951. The United States Supreme Court on January 7, 1952, dismissed an appeal from the order denying the writ (342 U.S. 908 [72 S.Ct. 304, 96 L.Ed. 679]) "for want of a substantial federal question."

The defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action; that the court had no jurisdiction of the subject matter of the action; that the plaintiff has not the legal capacity to sue; and that the complaint is uncertain, ambiguous and unintelligible in that it cannot be ascertained therefrom under what law the defendant has incurred a penalty to the People.

The special demurrer is without merit and will receive no further notice. The jurisdiction of the superior court to entertain the action and the right of the commission to direct its prosecution are supplied by section 2104 of the Public Utilities Code. The consideration of the general demurrer will dispose of the pertinent questions raised on the appeal.

At the outset it is urged by the plaintiff that the prior decision of the commission followed by the order of this court denying a writ of review and the dismissal of the defendant's appeal by the Supreme Court of the United States has resulted in res judicata as to certain issues involved in the present action. These include the determination (1) that the commission had jurisdiction to fix the intrastate fares of the defendant; (2) that the status of the defendant is that of a public utility subject to regulation as contemplated by

---

*This section was reenacted in 1951 as section 2107 of the Public Utilities Code with no substantial change.

the Constitution of this state; and (3) that the Civil Aeronautics Act of 1938, as amended, has not deprived this state of the power, through the commission, to regulate the defendant's intrastate fares.

The determination as to these three questions was made, the plaintiff asserts, in the exercise by the commission of its judicial power, and was and is to that extent as conclusive as would be a final judgment of a court of record.

█ Under the Constitution and statutes of this state the commission is possessed of broad and comprehensive powers. It has wide administrative powers. It has legislative powers, such, for example, as the fixing of rates of public utilities, the exercise of which is prospective in operation and legislative in character. (*Southern Pac. Co.* v. *Railroad Com.,* 194 Cal. 734, 739 [231 P. 28].) That it also possesses judicial powers may not be questioned. (*People* v. *Lang Transportation Co.,* 217 Cal. 166, 170 [17 P.2d 721].) █ When its determinations within its jurisdiction have become final they are conclusive in all collateral actions and proceedings. (Pub. Util. Code, § 1709.) █ Direct attack is made available by application for writ of review to this court in accordance with the provisions of section 1756 of the Public Utilities Code. We are not herein dealing with a determination of the commission made in the exercise of its judicial power where no direct attack, on constitutional or other grounds, has been made within the time provided by section 1756.

█ However, it seems clear that where those determinations have been appropriately and unsuccessfully challenged, as here, by direct attack and have run the gamut of approval by the highest courts, state and federal, they should have the conclusive effect of res judicata as to the issues involved where they are again brought into question in subsequent proceedings between the same parties. (*Sunshine A. Coal Co.* v. *Adkins,* 310 U.S. 381 [60 S.Ct. 907, 84 L.Ed. 1263].)

Whether the order of the Supreme Court of the United States dismissing the appeal of the defendant "for want of a substantial federal question" is res judicata in that court on the question of alleged federal control of intrastate rates, is not for this court to decide. █ It is established, however, that the denial by this court of a petition for review of an order of the commission is a decision on the merits both as to the law and the facts presented in the review proceedings. (*Southern Calif. Edison Co.* v. *Railroad Com.,* 6 Cal.2d 737, 747 [59 P.2d 808].) This is so even though

the order of this court is without opinion. (*Napa Valley Elec. Co.* v. *Railroad Com.*, 251 U.S. 366 [40 S.Ct. 174, 64 L.Ed. 310].) In the last cited case it was held at pages 372 and 373 that a denial by this court of an application for a writ of review is "tantamount to a decision of the court that the orders and decisions of the Commission did not exceed its authority or violate any right of the several petitioners under the Constitution of the United States or of the State of California"; that the "absence of an opinion by the Supreme Court did not affect the quality of its decision or detract from its efficacy as a judgment upon the questions presented, and its subsequent conclusive effect upon the rights of the Electric Company," and that it was "a final judicial determination" and "as effectual as an estoppel as would have been a formal judgment upon issues of fact." (See, also, *Funeral Dir. Assn.* v. *Board of Funeral Directors & Embalmers*, 22 Cal.2d 104, 107, 108 [136 P.2d 785]; *Southern Calif. Edison Co.* v. *Railroad Com., supra*, 6 Cal.2d 737, 747; *People* v. *Hadley*, 66 Cal.App. 370, 375 [226 P. 836]; *Southern Pac. Co.* v. *Van Hoosear*, 72 F.2d 903; *Consolidated Freightways, Inc.* v. *Railroad Com.* (1951), 36 F.Supp. 269, 270; *Adams* v. *Decoto* (1927), 21 F.2d 221.)

██ The defendant relies on the case of *Stratton* v. *Railroad Commission*, 186 Cal. 119, which contains declarations that appear to be contrary to other and later decisions of the courts on the subject. It was said in that case at page 126 that "the commission is not a judicial tribunal in the strict sense." That statement is of course true. The commission is not a judicial tribunal constitutionally established as a part of the judicial department of the state. ██ It is also observed that the commission is in the position of acting at times as informer, prosecutor, jury and judge in matters coming before it. This takes place, for example, when the commission on its own motion issues an order directing some person, firm or corporation within its regulatory jurisdiction to show cause why it should not be required to perform or not perform a certain designated act or be subject to discipline for performing an act contrary to law or public utility regulation. ██ The proceeding may take on the character of an adversary proceeding in which the commission furnishes evidence, judicially passes upon the competence and weight of that evidence and makes an order based upon it. This kind of establishment was seriously criticized in its early stages by

those affected by it. ■ But it is the law that when the system has been duly authorized by the Constitution of the state and the procedure is such as to satisfy the requirements of due process, both state and federal, no valid objection can be made to it. ■ Due process as to the commission's initial action is provided by the requirement of adequate notice to a party affected and an opportunity to be heard before a valid order can be made. (See *Southern Pac. Co.* v. *Public Utilities Com.* (1953), 41 Cal.2d 354, 365 [260 P.2d 70].) ■ When the commission has acted and an interested party is dissatisfied due process is further afforded by the right of petition for a writ of review to this court. ■ And of course no law of this state could deprive a party whose rights were prejudicially affected of the right to apply to the Supreme Court of the United States for relief on federal constitutional grounds.

So, while it is true that the commission is not a judicial tribunal in a strict sense, it does not follow that it does not possess well established and well understood judicial power.

■ It was also said in the Stratton case that "the commission is essentially an administrative and legislative tribunal, and not a court," and the fact that the commission must make determinations of fact for its own guidance "does not make it a court or change the character of its decrees from administrative or legislative orders into judicial judgments." These and other statements in the opinion in that case are inconsistent with the decisions of this court both before and after it on the subject of the judicial power of the commission. Insofar as they are so inconsistent they are overruled.

■ There can be no question but that the commission exercised its judicial power in determining the three matters above referred to. They were involved and extensively presented to the commission in the prior proceedings and to this court on the application for the writ of review. They are at issue in the present case. The subject matter of the two proceedings is to that extent the same. The parties are essentially the same. (*Sunshine A. Coal Co.* v. *Adkins, supra,* 310 U.S. 381, 402.) The fact that other matters are also involved in the present case, such as the validity, force and effect of section 2107 of the Public Utilities Code, and the question whether the Constitution itself prohibits certain designated action by public utilities, does not detract from the effect of those determinations as conclusive insofar as this

case is concerned. (See *Dillard* v. *McKnight*, 34 Cal.2d 209, 214, 215 [209 P.2d 387, 11 A.L.R.2d 835] ; *Bernhard* v. *Bank of America*, 19 Cal.2d 807, 811-813 [122 P.2d 892] ; *Todhunter* v. *Smith*, 219 Cal. 690, 695 [28 P.2d 916].)

 That conclusiveness arises by operation of law. It is the order and not the reasons for it that establishes its effectiveness. (*Bank of Visalia* v. *Smith*, 146 Cal. 398, 402 [81 P. 542] ; 15 Cal.Jur. 66, 98-99, § 167.) Attention is again called to the fact that when this court denied the writ of review in the prior proceedings no reasons for the order were given. Since the conclusions on this appeal with reference to the three stated questions are to be the same as those which to that extent formed the basis for the order denying the writ, and the judgment herein is to be reversed, it is deemed desirable to state all of the reasons for the reversal including those which led to the denial of the writ, to the end that none of the reasons for such denial be left to implication or conjecture.

In order to determine whether the defendant is amenable to state rate regulation under the provisions of the Constitution and statutes as alleged in the complaint it is necessary to look first to the Constitution. As adopted in 1879, section 22 of article XII provided for the election of three Railroad Commissioners and stated in part: ''Said commissioners shall have the power, and it shall be their duty, to establish rates of charges for the transportation of passengers and freight by railroad or other transportation companies. . . .'' In 1911 this section was amended to create a Railroad Commission in lieu of the former commission, and to provide:

''. . . Said commission shall have the power to establish rates of charges for the transportation of passengers and freight by railroads and other transportation companies, and no railroad or other transportation company shall charge or demand or collect or receive a greater or less or different compensation for such transportation . . . between the points named in any tariff of rates, established by said commission, than the rates . . . which are specified in such tariff. . . .''

Also added to this section in 1911 was the declaration:

''No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon the railroad commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the . . . com-

mission in this Constitution, and the authority of the Legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution.''

In 1946 section 22 was again amended, continuing the ''Railroad Commission'' in existence as the ''Public Utilities Commission.'' The portions of the section above quoted were unchanged.

■■ The commission is therefore a regulatory body of constitutional origin, deriving certain of its powers by direct grant from the Constitution which created it. (*Pacific Tel. & Tel. Co.* v. *Eshleman* (1913), 166 Cal. 640 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A.N.S. 652] ; *Morel* v. *Railroad Com.* (1938), 11 Cal.2d 488 [81 P.2d 144].) The Legislature is given plenary power to confer other powers upon the commission. Art. XII, §§ 22 and 23.) As to the scope of those powers we look to the legislation enacted in the exercise of that power, principally the Public Utilities Code, and to the decisions of this court in construing them. ■■ · Such additional powers ''must be cognate and germane to the regulation of public utilities, and when the power thus conferred relates to the regulation of transportation companies, it must be cognate and germane to the regulation of railroads or other transportation companies that are in fact common carriers. [Citing cases.]'' (*Morel* v. *Railroad Com., supra,* 11 Cal.2d 488, 492.)

Section 20 of article XII as originally adopted in 1879 prohibited any railroad company ''or other common carrier'' from combining or contracting with another ''common carrier'' to have the earnings of one doing the carrying shared by the other not doing the carrying, and provided that whenever a railroad corporation should lower its rates of fare for the purpose of competing with any other common carrier, such reduced rate should not again be raised from that standard without the consent of the governmental authority in which shall be vested the power to regulate fares and freights. In 1911 this section was amended to read:

''No railroad or other transportation company shall raise any rate of charge for the transportation of freight or passengers or any charge connected therewith or incidental thereto, under any circumstances whatsoever, except upon a showing before the . . . commission provided for in this Constitution, that such increase is justified, and the decision of the said commission upon the showing so made shall not be subject

to review by any court except upon the question whether such decision of the commission will result in confiscation of property.''

Sections 20 and 22 directly confer upon the commission power over the rates of ''transportation companies'' and section 20 directly prohibits such companies from increasing their rates without commission authorization. The next inquiry is whether this defendant is a ''transportation company'' within the meaning of these sections.

From earlier times rates for the transportation of persons and property for hire as common carriers have been subject to government regulation and control. (*Munn* v. *Illinois*, 94 U.S. 113, 125 [24 L.Ed. 77]; *People* v. *Budd*, 117 N.Y. 1 [22 N.E. 670, 682, 15 Am.St.Rep. 460, 5 L.R.A. 559].) In matters within the jurisdiction of a state, such control has existed in California almost from our beginning. While administrative bodies at first were concerned with railroads and their associated activities, the language employed in article XII of the Constitution of 1879, and subsequent amendments, clearly indicates the intention and purpose that such controls should extend not merely to ''railroads'' but to ''railroads and other transportation companies.'' This latter phrase is so frequently employed in article XII as to leave no doubt as to its enlarging effect.

The fact that airline transportation companies were not in existence when the Constitution was adopted in 1879 does not make them any the less ''transportation companies'' within the meaning and contemplation of article XII.

It was well said by the Supreme Court of Nebraska in *State ex rel. State Railway Com.* v. *Ramsey* (1949), 151 Neb. 333, at page 338 [37 N.W.2d 502]: ''. . . A constitution is intended to meet and be applied to any conditions and circumstances as they arise in the course of the progress of the community. The terms and provisions of constitutions are constantly expanded and enlarged by construction to meet the advancing affairs of men. While the powers granted thereby do not change, they do apply in different periods to all things to which they are in their nature applicable. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U.S. 1, 24 L.Ed. 708; 11 Am.Jur., Constitutional Law, § 51, p. 660; 9 Am.Jur., Carriers, § 4, p. 430. These principles have been held to be applicable to transportation by air. 'Transportation, as its derivation denotes, is a carrying

across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result.' *Curtiss-Wright Flying Service* v. *Glose*, 66 F.2d 710, certiorari denied 290 U.S. 696 [54 S.Ct. 132, 78 L.Ed. 599], . . . [citations omitted].''

The question in regard to each new type of transportation is whether the Constitution excludes by necessary or even by fair implication all control over transportation companies of the character here involved.

Section 17 of article XII of the Constitution provides:

''All railroad, canal, and other transportation companies are declared to be common carriers, and subject to legislative control. . . .''

Section 23, as adopted and unchanged by the 1914 amendment, provides:

''Every private corporation, and every individual or association of individuals, owning, operating, managing, or controlling any commercial railroad, interurban railroad, street railroad, canal, pipe line, plant, or equipment, . . . within this State, for the transportation or conveyance of passengers . . . or freight of any kind, . . . either directly or indirectly, to or for the public, and every common carrier, is hereby declared to be a public utility subject to such control and regulation by the . . . Commission as may be provided by the Legislature, and every class of private corporations, individuals, or association of individuals hereafter declared by the Legislature to be public utilities shall likewise be subject to such control and regulation. The . . . Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers upon the . . . Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution. . . . Nothing in this section shall be construed as a limitation upon any power conferred upon the . . . Commission by any provision of this Constitution now existing or adopted concurrently herewith.''

This section as originally adopted in 1879 merely provided for the districting of the state into three districts.

The comprehensive grant of power over rates conferred upon the commission by sections 20 and 22 is not nullified or limited by the language appearing in section 17 and

23 to the effect that such rates are "subject to legislative control." The provisions of these sections are not out of harmony, but if there is any doubt about it the special provisions of sections 20 and 22 should prevail over the general provisions of sections 17 and 23. The concluding sentence of section 23 confirms this conclusion. Under familiar rules of construction, if it is impossible to harmonize or reconcile portions of a constitution, special provisions control more general provisions, and the general and special provisions operate together, neither working the repeal of the other. (*Martin* v. *Election Comrs.*, 126 Cal. 404 [58 P. 932]; 11 Cal.Jur.2d 352-353; 11 Am.Jur. 663.) Recourse may be had to the whole instrument to ascertain the intent and purpose of its provisions and it should, if possible, be construed so as to avoid a repugnancy.

The defendant urges that the provisions of sections 20 and 22 are too vague to be self-executing, and that the Legislature has not provided any implementing legislation. "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced. . . ." (Cooley's Const. Limitations, 8th ed., p. 167.)

Although a constitutional provision may be self-executing the Legislature may enact legislation to facilitate the exercise of the powers directly granted by the Constitution. (*Chesney* v. *Byram* (1940), 15 Cal.2d 460, 463 [101 P.2d 1106].) "It is not and will not be questioned but that if the constitution has vested such power, it is not within the legislative power, either by its silence or by direct enactment, to modify, curtail, or abridge this constitutional grant." (*Western Assn. etc. R.R.* v. *Railroad Com.* (1916), 173 Cal. 802, 804 [162 P. 391, 1 A.L.R. 1455].)

Furthermore, the omission of any express sanctions in article XII for enforcing the provisions of sections 20 and 22 does not justify the conclusion that those sections were not intended to be self-executing. Section 22 of article XII as adopted in 1879 directly imposed penalties, drastic ones, upon corporations and their officers, agents or employees for violation of the constitutional prohibitions against unauthorized rates, discrimination, etc. It is true that the 1911 amendment omitted these express sanctions. But the prohibitions of section 20 were added at that same time. Such prohibitions were not left to the discretion of the Legislature.

638

 No legislation was required to make the constitutional language more prohibitory and no legislation enacted could limit or detract from it. (*Oakland Paving Co.* v. *Hilton*, 69 Cal. 479, 483 [11 P. 3].) But to aid in its enforcement section 24 of article XII has at all times provided as follows: "The Legislature shall pass all laws necessary for the enforcement of the provisions of this article." Sections 20, 22 and 23 are a part of that article. This action was filed against the defendant because it violated the prohibitions of article XII and section 2107 of the Public Utilities Code was re-enacted pursuant to the mandatory duty of the Legislature to pass all laws necessary to carry into effect the constitutional purpose.

Defendant urges that the Legislature did not intend an air carrier to be included within the category of a "public utility" for the purposes of section 2107 or of any other part of the Public Utilities Code and that, therefore, the penalties prescribed in section 2107 are not applicable to and cannot be imposed upon it. Legislative intent should be determined from the language of the statute. Significance should be given, if possible, to every word, phrase, sentence and part of an act. (*Gates* v. *Salmon*, 35 Cal. 576 [95 Am. Dec. 139].) When a statute prescribes the meaning to be given to particular terms used by it, that meaning is generally binding on the courts. (*Rideaux* v. *Torgrimson*, 12 Cal.2d 633 [86 P.2d 826]; *In re Monrovia Evening Post*, 199 Cal. 263 [248 P. 1017].) Section 203 of the Public Utilities Code states: "Unless the context otherwise requires, the definitions and general provisions set forth in this chapter govern the construction of this part." The term "transportation companies" is nowhere defined in the code nor is there any specific reference therein to airline carriers. Section 211 defines "Common Carrier"* and section 216 defines "Public

---

*§ 211. "Common carrier" includes:

(a) Every railroad corporation; street railroad corporation; express corporation; freight forwarder; dispatch, sleeping car, dining car, drawing-room car, freight, freight-line, refrigerator, oil, stock, fruit, car loaning, car renting, car loading and every other car corporation or person operating for compensation within this State.

(b) Every corporation or person owning, controlling, operating or managing any vessel engaged in the transportation of persons or property for compensation between points upon the inland waters of this State or upon the high seas between points within this State. . . .

(c) Every "passenger stage corporation" operating within this State.

(d) Every highway common carrier and every petroleum irregular route carrier operating within this State.

Utility."† Each definition states that it "includes" the corporations thereafter enumerated.

The term "includes" is ordinarily a word of enlargement and not of limitation. (*Oil Workers Int. Union* v. *Superior Court,* 103 Cal.App.2d 512, 570 [230 P.2d 71].) The statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions. (*Gray* v. *Powell,* 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301].) The definitions contained in sections 211 and 216 of the Public Utilities Code do not appear to be limited to the inclusions. Section 216, subdivision (a), leaves open for consideration what other types of entities are embraced within the words "Public Utility" when used in a particular context. (Pub. Util. Code, § 203.) Section 2107 subjects to penalties any public utility which violates "any provision of the Constitution of this State or of this part." To hold that this section applies only to public utilities enumerated in the definition of "Public Utility" or "Common Carrier" would ignore the words "of the Constitution" contained therein and would violate the letter and purpose of chapter 11 on violations, of which section 2107 is a part. Section 2101 commands the commission to see that the provisions of the Constitution affecting public utilities and violations thereof are promptly prosecuted. Other sections of that chapter provide the machinery for the prosecution of such offenses and the collection of penalties. Chapter 11 indicates an awareness by the Legislature of its duty to provide for the enforcement of the constitutional provisions and its intention to fix the punishment for such violations.

Confusion is asserted to have resulted from divergent holdings of this court on the question whether a carrier which is in fact a common carrier transportation company should be subject to rate regulation by the commission although not specifically mentioned in the Constitution or the statute. This question was raised in 1901 in *Railroad Comrs.* v. *Market St. Ry. Co.,* 132 Cal. 677 [64 P. 1065]. In that case the commission sought to compel the Market Street Railway Company to submit its records to the commission for regulatory

---

†§ 216. (a) "Public utility" includes every common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger, warehouseman, and heat corporation, where the service is performed for or the commodity delivered to the public or any portion thereof.

purposes. The proceeding involved a combination of the constitutional sections as adopted in 1879 and an act of the Legislature passed April 15, 1880, which specially excluded a street railroad from the definition of a "transportation company" as that term was used in the Constitution. It was held that a street railway company had not been specifically named in the Constitution; that under the statute a street railway company operating within a municipality was not a transportation company within the meaning of the Constitution and was therefore not subject to regulatory control by the commission. Obviously that case is not applicable here.

The scope of the regulatory powers of the commission under the Constitution as amended in 1911 was considered in 1916 in *Western Assn. etc. R. R.* v. *Railroad Com., supra,* 173 Cal. 802. In that case the association, consisting of some 15 railroads, filed a petition with the commission seeking to have it assume the regulation of certain motor truck and transportation companies conveying freight and passengers on the public highways as common carriers. The commission declined to entertain the petition on the ground that the law had not vested in it the power to do so. Mandamus was sought to compel the commission to assume jurisdiction. It appeared that the freight truck lines and the electric and motor bus passenger conveyances were transportation companies and common carriers operating intercity. It was held that notwithstanding the fact that they were not specifically mentioned in the Constitution or the statutes they were undeniably public utilities and subject to the regulatory power of the commission. It was said at page 808 with regard to motor trucks and stages, that "nothing in the language of the grant excludes them, and no legitimate construction upon the phrase so oft quoted demands their exclusion. It must be and therefore is held that the constitution has granted regulatory powers over such corporations to the . . . commission by virtue of section 22, article XII, of the Constitution. . . ." The Market Street Railway case was distinguished on the ground that that company was operating within a municipality and was not under the law subject to the commission's power of regulation.

The question of the power of the commission to regulate rates of taxicab companies operating wholly within a municipality required the attention of this court in *In re Martinez,* 22 Cal.2d 259 [138 P.2d 10]. The question there was whether

the fares of taxicabs so operating were subject to regulation by the commission or pursuant to the provisions of a city ordinance. In that proceeding in habeas corpus the commission, as amicus curiae, stated that it had consistently taken the position that its jurisdiction pursuant to statutes enacted under the authority of section 23 of the Constitution did not extend to the regulation of local taxicabs and for that reason it had never attempted to regulate their operations. This court concurred in that view and also held that consistently therewith there was a legislative intent to exempt taxicabs from state regulation. The court discharged the writ. An additional reason for the order was stated to be that no authorization in the commission to regulate taxicab fares could be found in the statute because taxicabs were not specially mentioned therein as common carriers. There was no occasion to indicate in that case that a private corporation, admittedly and conclusively shown to be in fact a transportation company, a statewide common carrier of passengers for hire, and a public utility, should be freed from regulation as to its intrastate rates pursuant to the grant of power to the commission under section 22 merely because it was not specifically named as such in that section or in the statute passed by the Legislature under the authority of section 23.

The argument of the defendant that the specific references in Article XII to "railroads and other transportation companies" must for certainty limit the "other transportation companies" mentioned to ground carriers, is without merit. Airline carriers, like motor trucks and automobile stages, are forms of transportation unknown at the time the Constitution was adopted, and whether or not the Legislature has since that time acted with reference to them, they are within the regulatory powers of the commission under the principles laid down in the Short Line Railroad cases.

It follows that the defendant air carrier is a public utility within the ordinarily accepted meaning of that term and within the meaning and contemplation of sections 20 and 22 of article XII of the Constitution. It has violated the prohibitions of section 20 of that article. It is therefore subject to the penalties of section 2107 for violation of the constitutional provision.

Our conclusions in the present case are in accord with the determinations of this court in 1916 in the Short Line Railroad cases and with the holding in the proceedings wherein

this court in August, 1951, denied the petition of this defendant for a writ of review to annul the order of the commission. Anything in the Martinez case which is out of harmony with these conclusions is overruled.

 In further support of its demurrer the defendant argues that the provisions of section 2107 as applied to it are unreasonable and oppressive and therefore in violation of the due process and the equal protection clauses of the federal Constitution, citing *Ex Parte Young*, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714]; *Cotting* v. *Kansas City Stock Yards*, 183 U.S. 79 [22 S.Ct. 30, 46 L.Ed. 92]; *Beckler Produce Co.* v. *American Ry. Exp. Co.*, 156 Ark. 296 [246 S.W. 1, 26 A.L.R. 1197]; and *Natural Gas Pipeline Co.* v. *Slattery*, 302 U.S. 300 [58 S.Ct. 199, 82 L.Ed. 276]. There is no merit in this contention. The defendant was not under any compulsion to increase its rates without a hearing before subjecting itself to the risk of penalties. It could have obtained a determination of its rights and obligations under California law without exposing itself to the risk of penalties.

No showing is made that the penalties prescribed by section 2107, $500 to $2,000 a day, are oppressive. While factors in extenuation of defendant's action may be considered by the trial court in determining the merits of this controversy, they are not proper matters for consideration on this appeal. It is observed, moreover, that under section 2104 of the Public Utilities Code, the action may be "compromised or discontinued on application of the commission upon such terms as the court approves. . . ."

It is further contended by the defendant that any regulation of air carriers by states is barred by the Civil Aeronautics Act of 1938, as amended (52 Stats. 977, 49 U.S.C. § 401 et seq.), and is against the national interest. This question was squarely raised in the hearings before the commission in the prior proceedings and was determined by the commission and by this court contrary to the contention. It formed one of the bases of the appeal to the Supreme Court of the United States. The jurisdictional statement on that appeal recited the issues there to be: "(1) Has the Civil Aeronautics Act of 1938, as amended, pre-empted the entire field of civil aviation to the exclusion of the right or power of any state or state agency to exercise jurisdiction or authority over commercial air transportation" and "(2) Is the Order of the Public Utilities Commission of the State of California, purporting to regulate the air coach tariff over

an [intrastate] segment of a federally certificated interstate air route, a burden on interstate commerce and thus in violation of subsection 3 of Section 8, Article I of the Constitution of the United States?'' (See Jurisdictional Statement, *Western Air Lines, Inc.,* Petitioner, v. *Public Util. Com. of the State of California,* Respondent, S. F. No. 18427, p. 13.) That appeal was dismissed by the Supreme Court ''for the want of a substantial federal question.'' (342 U.S. 908 [72 S.Ct. 304, 96 L.Ed. 679].) Mr. Justice Black and Mr. Justice Burton were of the opinion that probable jurisdiction should be noted. While it would seem that the right of the state commission to regulate the intrastate rates of this defendant and of others similarly situated has been judicially established and that this might be sufficient for the determination of this issue so far as this court is concerned, again we prefer, in view of the present arguments, to state the reasons why the defendant's contentions are not persuasive.

It appears beyond question that the power of Congress under the commerce clause extends to the regulation of ''modes of interstate commerce unknown to the fathers'' (*In re Debs,* 158 U.S. 564, 591 [15 S.Ct. 900, 39 L.Ed. 1092]) and includes the regulation of the interstate operation of air carriers. The extent to which Congress has asserted such jurisdiction over civil aviation depends upon the terms of the legislation which it has adopted. This legislation is chiefly embodied in the Civil Aeronautics Act of 1938, as amended. A review of that act indicates that two kinds of jurisdiction have been there asserted by Congress, —one over safety factors, the other over economic factors. We are not here concerned with the provisions of the act applicable to safety regulations except to note that the extent of federal jurisdiction over those factors (§§ 601-610, 49 U.S.C. §§ 551-560) seems to be based on the definition of ''air commerce'' contained in section 1(3) (49 U.S.C. § 401(3), (1940)). It is there provided: '' 'Air commerce' means interstate, overseas, or foreign air commerce or the transportation of mail by aircraft or any operation or navigation of aircraft within the limits of any civil airway or any operation or navigation of aircraft which directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce.''

The jurisdiction asserted by Congress in the local economic regulatory field is not covered. Section 1(2) (49 U.S.C. § 401(2)) defines ''air carrier'' as one engaged in ''air transportation.'' ''Air transportation'' is defined in section

1(10) (49 U.S.C. § 401(10)) to mean "interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." "Interstate air transportation" is defined by section 1(21) (49 U.S.C. § 401(21)) to mean "the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between, respectively,

"(a) a place in any State of the United States, of the District of Columbia, and a place in any other State . . . or between places in the same State of the United States through the air space over any place outside thereof . . .

"(b) a place in any State of the United States . . . and any place in a Territory or possession of the United States . . .

"(c) a place in the United States and any place outside thereof. . . ."

Sections 601-610 (49 U.S.C. §§ 551-560) state the jurisdiction asserted over safety factors of air carrier regulations; sections 401-416 (49 U.S.C. §§ 481-496) over economic factors. Rates and tariffs are controlled by the latter sections. Under those provisions and the definitions contained in section 1 (49 U.S.C. § 401) it seems clear that Congress has not sought to extend the economic regulation of the board to intrastate transportation of persons or property other than mail; nor has it attempted to oust the states of control over such rates.

Defendant urges that section 401(2) (49 U.S.C. § 481(2)) is of special significance on the question of the jurisdiction of the board over intrastate rates because it authorizes the issuance of certificates of public convenience and necessity for the transportation of mail and all other classes of traffic for which authorization is sought between such points as "from Brownsville, Texas . . . to San Antonio, Texas." Obviously that section pertains to the necessity of federal certification. No question is here presented or determined as to the effect of this provision upon state certification; and the requirement of federal certification does not necessarily preclude state control of intrastate rates. The same observation applies to the provisions of section 403 (49 U.S.C. § 483) requiring air carriers to file tariffs with the board, of section 404 (49 U.S.C. § 484) requiring the observance of reasonable rates and charges, and of section 406 (49 U.S.C. § 486) empowering the board to fix the compensation to be paid to air carriers for the transportation of mail. The latter section authorizes the board to take into consideration "all other revenue of the air carrier" in determining the "need" of

such carrier for compensation for carrying the mail to enable it under "honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense." This language does not make it imperative that the board have exclusive control of "all other revenue." The only mandate is that it shall take all other revenue [including intrastate revenue] into consideration.

 There is no language indicating that Congress intended to preempt the field of economic regulatory control of air transportation so as to include the transportation of passengers solely between points within a state and not involving the use of the airspace outside of the state. We are not concerned on this appeal with the question whether Congress could properly assert such power. There appear to have been no decisions of the United States Supreme Court defining the limits of such regulatory control.

Attention has been called to numerous recommendations and bills presented to Congress, prior to and since the enactment of the Civil Aeronautics Act of 1938 seeking to extend federal economic regulation to include intrastate operations of air carriers, and also to the fact that none of these has been enacted into law.\* This would seem to strengthen the conclusion that Congress has not assumed control over carriers to the exclusion of state control as to their intrastate rates.

 Any doubts on the subject should be resolved in favor of state power for the principal reason, as stated, that the regulation of intrastate fares of common carriers traditionally has been subject to state regulation. It is true, as defendant points out, that Congress did not use language in the Civil Aeronautics Act of 1938 such as that employed in different legislation asserting its control over other kinds of common carriers in which it was expressly stated that such regulations

---

\*Report of the Federal Aviation Commission, Sen. Doc. No. 15, 74th Cong., 1st Sess. (Jan. 30, 1935) 237-239;

78th Congress: Lea-Bailey Aviation Bill introduced as H.R. 1012 and S. 246; revised form of Lea-Bailey Aviation Bill, H.R. 3420; Boren Bill, H.R. 4845; Reece Bill, H.R. 4848.

79th Congress: Lea Bill, H.R. 674; Johnson Bill, S. 541; Lea Bill, H.R. 3383.

80th Congress: Wolverton Bill, H.R. 2337.

81st Congress: Brewster Bill, S. 423; Johnson Bill, S. 445; Johnson Bill, S. 2435.

See, also, 1944 Natl. Assn. RR and Util. Comrs. Proceedings 221; 1945, id. p. 299; 1946, p. 210; 1947, p. 128; 1948, p. 69; 1949, p. 166; 1950, p. 106.

shall not be construed to interfere with the exclusive exercise by each state of the power to regulate intrastate commerce. (See § 1(2) Interstate Commerce Act (49 U.S.C. § 1) (railroads); § 202(b) Part II, Interstate Commerce Act (49 U.S.C. § 302) (motor carriers); § 303 (j) Part III, Interstate Commerce Act, (49 U.S.C. 903) (water carriers).) The failure to use such language in the Civil Aeronautics Act does not necessarily imply that federal regulation of air transportation was intended to exclude all state control. Railroads and motor carriers began as short-haul carriers. In their operations wholly within a state they have been traditionally subject to state regulation. In the early days of aviation the operating costs and necessarily the fares of the pioneering airlines were very high and as a consequence they could compete with surface carriers only on long hauls.* Consequently air transportation in this country has been predominately interstate and as such subject to federal control.

Also of significance in considering the extent of congressional action is the attitude of the Civil Aeronautics Board in the exercise of its powers under the act. As stated this defendant and the other carriers concerned had put the questioned increase in fares into effect on March 1, 1951, without commission authorization because they had been requested to make such increase as of that date by the chairman of the Civil Aeronautics Board and they had considered his request to be tantamount to a demand. In the proceedings subsequently initiated by the commission the carriers denied jurisdiction on the part of the commission over their rates and asserted the exclusive jurisdiction of the board. On the appeal to the United States Supreme Court from our order denying a writ of review the question whether the board had exclusive jurisdiction was precisely in issue. The board apparently did not have sufficient interest to intervene. The commission states that in more recent litigation in which the board did intervene (*United Air Lines* v. *Pub. Util. Com. of California*, 74 Sup.Ct. 151, Nov. 30, 1953) it has indicated its present attitude that its jurisdiction does not extend to intrastate rates.

Since 1939 the carriers authorized to transport passengers by air between the mainland of California and Santa Catalina Island have been subject to detailed regulatory control by the federal board. Tariffs for those operations were filed with that board but had never been filed with or required by the state

---

*See 11 Law & Contemporary Problems (1946), p. 429, at pp. 459 et seq. and pp. 488 et seq. for a symposium on this problem.

commission. Santa Catalina Island lies about 30 miles westward of the mainland and is a part of California. In September and December, 1951, the commission requested United Air Lines to file tariffs with it, asserting that the Catalina operations were not within the coverage of the Civil Aeronautics Act but were intrastate and subject to state regulation. No formal order was issued by the commission. In June, 1952, United Air Lines and Catalina Air Transport, a corporation, joined in a complaint filed in the United States District Court for the Southern District of California praying for declaratory and injunctive relief, alleging that the California commission was threatening to bring penalty and reparation proceedings against them. The board intervened for the purpose of asserting its exclusive jurisdiction. A three judge court ordered an injunction, upholding the exclusive jurisdiction of the board. That judgment was reversed by the Supreme Court [346 U.S. 402 [74 S.Ct. 151, 98 L.Ed. ——], Nov. 30, 1953) on technical grounds, citing *Public Service Com. of Utah* v. *Wycoff*, 344 U.S. 237 [73 S.Ct. 236, 97 L.Ed. 291]. However in the brief on appeal filed on behalf of the board it was stated that there "is no issue here presented of whether the Civil Aeronautics Act would pre-empt the field of economic regulation of the Catalina operations if those operations involved only flights over California territory, as, for example, do flights between Los Angeles and San Francisco. *United Air Lines* v. *Public Utilities Com. of California*, 342 U.S. 908 [72 S.Ct. 304, 96 L.Ed. 679], where this court dismissed an appeal from a rate order of the California Commission for want of a substantial federal question, involved air transportation between Los Angeles and San Francisco only, and is inapposite here." (Brief for Appellee Civil Aeronautics Board, p. 13.)

The argument that the interests of the United States require national uniformity in the regulation of air transportation through the total exclusion of state control is addressed to a matter of public policy which requires no consideration here.

From the foregoing it follows that the demurrer was improperly sustained.

Judgment reversed.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J., Dissenting.—It is my view that the opinions prepared for the District Court of Appeal in the companion

cases of *People* v. *United Air Lines, Inc.* (reported at *(Cal. App.) 258 P.2d 66), authored by Justice Wood[1] (Fred B.) and concurred in by Presiding Justice Peters and Justice Bray, and of *People* v. *California Central Airlines* (reported at *(Cal. App.) 258 P.2d 577), authored by Justice Drapeau and concurred in by Presiding Justice White and Justice Doran, adequately discuss and correctly resolve the issues which are presented on this appeal.

By reference I adopt each of such opinions in its entirety but to the end of avoiding unnecessary repetition in this dissent of either factual statement[2] or discussion of law, while at the same time making clear the grounds which I find compelling to the conclusion reached, I set out here only the following portions of the opinion prepared by Mr. Justice Wood: (pp. 68-71 of 258 P.2d.):

"The sole issue upon this appeal is whether or not this defendant by charging the increased rates mentioned, during the period March 1 to May 8, 1951, incurred penalties which under certain circumstances the provisions of section 2107 of the Public Utilities Code by its terms imposes. That section declares that 'Any *public utility* which violates or fails to comply with any provision of the *Constitution* of this State or of this part [§§ 2101 to 2113; the Public Utilities Code], or which fails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission, in a case in which a penalty has not otherwise been provided, is subject to a penalty of not less than five hundred dollars ($500) nor more than two thousand dollars ($2,000) for each offense.'[3] (Emphasis added.)

"The key words in this section are 'public utility.' Unless defendant is a 'public utility,' as that term is used in section 2107, it cannot be subject to the penalty which that section imposes.[4]

---

*Hearings were granted by the Supreme Court on August 6, 1953.

[1] Formerly Legislative Counsel to the Legislature of California, with a long and distinguished service in the field of statutory interpretation.

[2] The material allegations of the complaint are correctly stated in the majority opinion of this court.

"[3] § 2108 of the code states that every such violation is a separate and distinct offense, 'and in case of a continuing violation each day's continuance thereof shall be a separate and distinct offense.'"

"[4] During oral argument counsel for plaintiff expressed the view that the clause of section 2107 in which the word 'Constitution' appears makes the penalty applicable to a 'transportation company' which violates any provision of article XII even if such company is not a 'public utility' within the meaning of that term as used in the code.

"Logic is against such a view. The word 'Constitution,' appearing, as it does, in the object of the sentence, in no way changes or enlarges

"For a definition, we turn to section 216 of the code. It states that ' "Public utility" includes every common carrier, toll bridge corporation, . . . [and a number of types of corporations other than transportation companies] . . . where the service is performed for or the commodity delivered to the public or any portion thereof. . . .'

"Here the key words are 'common carrier,' defined in section 211 of the code as follows: ' "Common carrier" includes: (a) Every railroad corporation; street railroad corporation; express corporation; freight forwarder . . . [several types of car corporations] . . . operating for compensation within this State. (b) Every corporation or person, owning, controlling, operating, or managing any vessel engaged in the transportation of persons or property for compensation between points upon the inland waters of this State or upon the high seas between points within this State, except as provided in Section 212. "Inland waters" as used in this section includes all navigable waters within this State other than the high seas. (c) Every "passenger stage corporation" operating within this State. (d) Every highway common carrier and every petroleum irregular route carrier operating within this State.'

"In this definition of 'common carrier' there is no specific mention of common carrier by air. It is true that this enumeration of carriers is preceded by the word 'includes,' which ordinarily is used by way of illustration or enlargement, not by way of limitation. *Oil Workers International Union* v. *Superior Court,* 103 Cal.App.2d 512, 570, 230 P.2d 71, and cases there cited. Here, however, it appears that 'includes' is used as a word of limitation. The enumeration of several types of common carriers (railroad, street railroad, vessels, passenger stage corporations, highway common carriers) suggests an intention to include only the carriers specifically mentioned. The history of this section, which finds its prototype in subdivision (*l*) of section 2 of the Public Utilities Act of December 23, 1911 (Stats. 1911, Ex.Sess., ch. 14, p. 18, at pp. 19-20), compels such a conclusion.

the meaning of the subject, 'any public utility.' Especially so in view of the fact that such a change is not necessary to give meaning and effect to the phrase in which the word 'Constitution' occurs. Numerous transportation agencies that are included in the code concept of 'public utility' are subject to the constitutional mandates and prohibitions as well as to those expressed in the code.

"Moreover, it would have been easy to broaden the subject of the sentence in section 2107 by adding 'corporation or person' to 'public utility,' as was done in section 2113 of the code, when the legislature was dealing with contempt of any order of the commission."

"To get the full significance of this history, we start with the state Constitution of 1879, which imposed certain obligations upon carriers for hire and used certain terms in referring to them. Section 21 of article XII prohibited discrimination in charges or facilities for transportation by any 'railroad or other transportation company.' Section 22 of article XII gave the railroad commission power to establish rates of charges for transportation of passengers and freight by 'railroad or other transportation companies'; implemented by the power to examine books of such companies, issue subpoenas and other process, hear and determine complaints against such companies, take testimony, and punish for contempt. Section 19 of article XII declared that no 'railroad or other transportation company' shall grant free passes or tickets at a discount to any public officer other than a railroad commissioner. Section 17 of article XII said: 'All railroad, canal, and other transportation companies are declared to be common carriers, and subject to legislative control.' Section 18 used the expression 'railroad or canal company'; section 20, 'railroad company or other common carrier'.

"An Act of April 15, 1880, evidently designed to implement these provisions of the new Constitution, followed the pattern set by these sections of article XII, in the terms which it used. Thus, the 1880 act used the term 'transportation companies,' defining it, somewhat narrowly, to mean and include companies operating railroads (other than street railroad) or steamboats from port to port or upon the rivers and inland waters. (Stats. 1880, ch. 59, § 14, p. 45, at 48.) However, section 12 of this act was designed to implement the constitutional powers and duties of the railroad commission to the full extent of the constitutional grant, without limitation as to types of companies affected. (P. 48.)

"The Railroad Commission Act of March 19, 1909, continued to use the expression 'transportation company,' enlarging it to include 'railroads operated for commercial purposes, express companies, sleeping car companies, and companies operating vessels engaged in carrying freight or passengers on the waters of this state.' (Stats. 1909, ch. 312, p. 499; § 11, p. 501.)

"The Railroad Commission Act of February 9, 1911, followed much the same pattern. (Stats. 1911, Reg.Sess., ch. 20, p. 13.) In section 9 it declared: 'All railroad and other transportation companies, owned or operated by any individual, company, . . . or association are hereby declared to be com-

mon carriers, and under the jurisdiction, . . . of the commission and subject to the provisions of this act.' (P. 16.) But it continued to define 'transportation company' as meaning and including certain specified kinds of companies, adding several types of car companies. (§ 13, p. 17.) It imposed a penalty of $500 to $2,000 per day for willful failure by any railroad or other transportation company to comply with certain requirements of the statute or failure strictly to observe any rate established by the commission. (§ 41, p. 36.)

"At the special election held in October, 1911, the voters approved amendments to sections 20, 21, 22 and 23 of article XII of the Constitution. These amendments enlarged the membership of the Railroad Commission from three to five, made the members appointive instead of elective, and to some extent enlarged the constitutional grant of power to the commission, including the power to order reparation to any shipper for excessive or discriminatory rates charged him. In so doing it retained the use of the expression 'railroad or other transportation company' when dealing with the direct grant of constitutional power to the commission. Significantly, these amendments used a different form of expression when conferring 'plenary power' upon the Legislature to confer additional powers upon the commission. The 1911 amendment to section 23 declared that every private corporation, individual, or association owning or operating a 'commercial railroad, interurban railroad, street railroad, canal, pipe line, plant, or equipment, . . . for the transportation or conveyance of passengers . . . express . . . or freight . . ., or for the transmission of telephone or telegraph messages, or for the production, . . . or furnishing of heat, light, water or power or for the furnishing or storage or wharfage facilities, . . . to or for the public, *and every common carrier,* is hereby declared to be *a public utility subject to such control and regulation* by the railroad commission *as may be provided by the legislature,* and *every class* of private corporation, . . . *hereafter declared by the legislature to be public utilities* shall likewise be subject to such control and regulation.' (Emphasis added.)

"We may assume, for present purposes, that 'common carrier' as thus used in section 23 meant the same as defined in section 17 of the same article: 'All railroad, canal, and other transportation companies'. We may further assume, for the purpose of discussion, that airline transportation

companies were included in this definition of common carrier,[5] and hence, that a common carrier by air is a 'public utility' which section 23 gives the Legislature power to subject to the control and regulation of the commission. Has the Legislature done so, with this type of transportation company? The answer is furnished by the Public Utilities Act of December 4, 1911 [approved December 23, 1911], the first statute on this subject enacted after the adoption of the 1911 constitutional amendments. (Stats. 1911, Ex.Sess., ch. 14, p. 18.) Of prime significance, is the fact that the expression 'transportation company' was neither defined nor used in that act. We there find the same pattern that now obtains in the code. 'Common carrier' was defined by subdivision (*l*) of section 2 of the act as including certain specific types of transportation agencies (such as railroad corporations, street railroad corporations, car corporations, corporations operating vessels) without the use of 'transportation company' or other generic term. 'Public utility' was defined in subdivision (bb) of section 2 of that act as including every common carrier and certain specific types of agencies (such as pipe line, gas, electric, telephone, telegraph, and water corporations, wharfingers and warehousemen) without the use of 'transportation company' or similar expression. In each of those subdivisions, the definition expressly applied to the term defined 'when used in this act,' a limitation now expressed in section 203 of the code.

"It would seem, therefore, that the absence of the term 'transportation company' from the code is no accident; that it is the result of an intentional act of exclusion. This fact, coupled with the specific enumeration of carriers in the statutory definition of 'common carrier,' suggests that the Legislature, soon after the 1911 amendment of the Constitution, adopted the policy of not exercising its 'plenary' power over any new type of 'transportation company' (such as a stage line, truck line, or air line) until that type of transportation shall have been in operation long enough for the Legislature to determine how much, if any, regulation and control over it should be given the commission in addition to that directly conferred by the Constitution.

"Not inconsistent with this view was the construction placed

---

[5]The defendant herein does not in this proceeding question that it is a 'transportation company' as that term is used in the Constitution and, as such, is subject to the jurisdiction which the Constitution directly confers upon the Commission over such companies."

upon the statute by the commission and approved by the court in *Western Ass'n of Short Line R. R.* v. *Railroad Comm.*, 173 Cal. 802, 162 P. 391, 1 A.L.R. 1455, decided in December, 1916. The question at issue was whether or not common carriers by truck or stage upon the highways, operating between cities in this state, were subject to the jurisdiction of the commission. The court held that jurisdiction over such carriers, as 'transportation companies,' was conferred by section 22 of article XII of the Constitution.

"Concerning the lack of statutory regulation of carriers by stage or truck (methods of transportation that were relatively new in 1916), the court said: 'We agree with the construction placed by the commission upon the legislative enactments and with its conclusion that the Legislature inadvertently failed or deliberately declined to make a specific grant of power to the railroad commission to regulate the affairs of these classes of transportation companies. We need not here repeat the convincing reasoning of the commission in this behalf, since doubtless its views will find expression in its own official reports, and it is sufficient for the purposes of this determination to express our concurrence in and with them.' (173 Cal. at p. 804, 162 P. at p. 391.)

"The history of statutory changes on this subject since 1911 indicates adherence to a policy of the Legislature not to exercise its 'plenary' power over new types of transportation until experience might demonstrate a need therefor.

"An act adopted in 1917 imposed certain requirements upon the owners and operators of stages and trucks when functioning as common carriers. It placed them under the regulation and control of the commission. (Stats. 1917, ch. 213, p. 330.)

"The definition of 'common carrier' in the Public Utilities Act was enlarged in 1927 to include passenger stage corporations (Stats. 1927, ch. 42, p. 72 at 73, adding § 2¼ to the Act of 1915) ; in 1933, to add freight forwarders (Stats. 1933, ch. 784, p. 2083 at 2085, amending § 2 of the act) ; in 1935, to include highway common carriers (Stats. 1935, ch. 664, p. 1830 at 1831, adding § 2¾ to the act) ; and in 1949, to add petroleum irregular route carriers (Stats. 1949, ch. 1399, p. 2440 at 2441, amending § 2¾ of the act).

"Note should be made of a Supreme Court decision rendered in 1943 which held constitutional a certain city ordinance concerning taxicab service. We refer to *In re Martinez,* 22 Cal.2d 259, 138 P.2d 10. The court found that the Legislature had not yet put taxicabs under the jurisdiction of the com-

mission. After quoting the pertinent features of the statutory definitions of 'common carrier' and 'public utility,' the court said: 'Nowhere in the quoted provisions of the Public Utilities Act, nor in its other provisions, do we find any reference to taxicabs or taxicab companies. Each of the many agencies designated in subdivisions (dd) and (*l*) is specifically mentioned and described in detail or is included in groups carefully described in the act. If the Legislature had intended to include taxicabs it would not have omitted reference to them while including detailed descriptions of all other agencies covered by the act, some of which perform similar services. Moreover, references in other parts of the act to common carriers "subject to the provisions of this act" indicate a legislative intention not to include all common carriers.' (22 Cal.2d at p. 262, 138 P.2d at p. 11.)

"The court did not mention section 22 of article XII of the Constitution, which by its own terms puts 'railroad and other transportation companies' under the jurisdiction of the commission to a limited extent. Section 22, perhaps, was deemed inapplicable because it refers to compensation for transportation of passengers or freight 'between the points named in any tariff of rates' established by the commission, and the city ordinance in question was 'confined in its effect to service performed within the city.' (22 Cal.2d at p. 262, 138 P.2d at p. 12.)

"We note in passing that section 2113 of the code, relating to contempt of the commission and its power to punish such a contempt, is broader in its application than section 2107. Section 2113 applies to every 'public utility, *corporation, or person.*' That may well include a common carrier by air to the extent that such a carrier, viewed as a 'transportation company,' may be subject to the jurisdiction which section 22 of article XII of the Constitution confers upon the commission. Our attention has been called to no other provision of the Public Utilities Act portion of the code which directly or indirectly mentions common carriers by air."

The foregoing quotation from the opinion of Justice Wood satisfies me that the judgment of the trial court should be affirmed, but, in view of the fact that the majority of this court have concluded that the judgment should be reversed, I deem it proper to add these observations:

The majority (if they must reach the decision they do reach) properly point out that the commission by its decision of April

24, 1951 (which by its own terms was not to become effective until May 9, 1951), "expressly advised the companies that they would *thereafter* be deemed to be transportation companies, common carriers and public utilities within the meaning of the state constitution and be subject to its prohibitions and requirements." (Italics added.) The majority opinion further states "It is also observed that the commission is in the position of acting at times as informer, prosecutor, jury and judge in matters coming before it" and "Confusion is asserted to have resulted from divergent holdings of this court on the question whether a carrier which is in fact a common carrier transportation company should be subject to rate regulation by the commission although not specifically mentioned in the constitution or the statute."

The majority opinion continues: "In further support of its demurrer the defendant argues that the provisions of section 2107 as applied to it are unreasonable and oppressive and therefore in violation of the due process and the equal protection clauses of the federal Constitution, . . . There is no merit in this contention. The defendant was not under any compulsion to increase its rates without a hearing before subjecting itself to the risk of penalties. It could have obtained a determination of its rights and obligations under California law without exposing itself to the risk of penalties.

"No showing is made that the penalties prescribed by section 2107, $500 to $2000 a day, are oppressive."

I strongly disagree with the last quoted statement. In my estimation the majority opinion on its face, by virtue of the very facts which I have quoted from it above, leads to the conclusion that to apply the penalties under the circumstances shown would be unjust and oppressive. To state, as do the majority, that "The defendant was not under any compulsion to increase its rates without a hearing before subjecting itself to the risk of penalties" seems to me to at least border on the edge of unreality or inaccuracy.

It must be remembered that the only misconduct of the defendant upon which the commission and this court rely for invoking, for the first time in the history of this state as against an air carrier, the penal provisions of section 2107 of the Public Utilities Code, is that it put in effect a fare increase which, as appears on the face of the majority opinion, not only in the case of this defendant but also in the cases of its fellow defendants, was "made in response to a request by the chair-

man of the federal Civil Aeronautics Board, which they [the air carrier defendants] believed to be compulsory upon them.''

As to the element of compulsion in this respect, it is to be remembered that this defendant must use exclusively—whether in interstate or intrastate commerce—airplanes which are subject to federal regulation in respect to certification, maintenance, and operation; the airways over which they fly are federally equipped and operated; the number of passengers which any given plane may carry under varying conditions, its gross load, and the rates the defendant will receive for mail (if it has a mail contract) are all subject to exclusive federal control; likewise the defendant's crewmen must be federally certificated; regulations covering the hours they may work, their qualifications and the minimums of procedures for maintenance of proficiency, are all to be found in the federal Civil Air Regulations.

That the defendants in this and the companion cases (and their able counsel) had reasonable grounds for their course of conduct seems to me to be further indicated by the fact that until this day every judge who had passed upon the matter agreed with them; that includes two judges of the superior court and six justices of the District Court of Appeal. In the face of the fact that so many distinguished legal minds have concluded that on the facts pleaded the defendants cannot be held to be subject to the penal provisions of the statute relied on, it seems to me to be inescapable that at the very least such statute, insofar as concerns its applicability to defendants on the facts, must admit of differing conclusions by reasonable minds. In such circumstance I think that we should follow the usual rule and accord the benefit of any reasonable doubt to the defendant. ''When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. In other words, criminal statutes will not be built up 'by judicial grafting upon legislation . . . [I]t is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' '' (*People* v. *Ralph* (1944), 24 Cal.2d 575, 581 [150 P.2d 401]; *People* v. *Valentine* (1946), 28 Cal.2d 121, 143 [169 P.2d 1]; see, also, *In re McVickers* (1946), 29 Cal.2d 264, 278 [176 P.2d 40]; *In re Bramble* (1947), 31 Cal.2d 43, 51 [187 P.2d 411]; *People* v. *Chessman*

(1951), 38 Cal.2d 166, 182 [238 P.2d 1001]; *Ex parte Rosenheim* (1890), 83 Cal. 388, 391 [23 P. 372]; *People* v. *Sayre* (1937), 26 Cal.App.2d Supp. 757, 761 [70 P.2d 546].)

For all of the reasons above stated, I would affirm the judgment.

·Edmonds, J., concurred.

Respondent's petition for a rehearing was denied April 28, 1954. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.