## CURTISS–WRIGHT FLYING SERVICE, Inc., v. GLOSE.

### No. 5008.

Circuit Court of Appeals, Third Circuit.

Aug. 25, 1933.

McDermott, Enright & Carpenter, of Jersey City, N. J., and Henry G. Hotchkiss, of New York City (James D. Carpenter, Jr., of Jersey City, N. J., and Howard Osterhout, of New York City, of counsel), for appellant.

Colie & Colie, of Newark, N. J., and Edgar R. Kraetzer, of New York City (Stanley W. Schaefer, of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below Mrs. Kathleen I. Glose, hereafter called plaintiff, widow of C. William Glose, recovered a verdict against the Curtiss-Wright Flying Service, Incorporated, hereafter called defendant, for damages suffered by her through the death of her husband, alleged to have been brought about by defendant's negligence. Thereupon defendant took this appeal.

The proofs tend to show that plaintiff's husband on February 13, 1930, bought at Miami, Fla., from the Curtiss Flying Service, a Florida corporation, a trip ticket for an airplane journey from Miami to Tampa and return. After the disaster in question, the Curtiss-Wright Flying Service, a Maine corporation, bought from the Florida corporation its assets and assumed its liability in the present suit. It will hereafter be referred to as defendant. On the morning of February 14, 1930, the deceased, at defendant's airport in Miami, boarded its airplane, under charge of its pilot licensed for transport by the Department of Commerce. He was the only passenger, and the journey proceeded without incident until the plane was about twenty-two miles from Tampa, when, probably due to fog, the pilot turned from continuing straight to Tampa and attempted to land at the plant of the United States Phosphoric

Company. In his effort to do so, the plane crashed, and the pilot and his passenger were both killed.

Setting aside minor questions, all of which have been duly considered, the case resolves itself into three underlying ones, viz.: First, was the decedent a charterer of the plane or a passenger; second, was there evidence from which a jury could infer negligence of the defendant; third, was the limit of the defendant's liability for negligence in his ticket valid.

■ Turning to the question of charterer or passenger, we note that the contract between the parties is evidenced by the ticket issued by defendant. To our mind, the terms thereof clearly evidence the relation of passenger and carrier, and not that of a plane charterer. The paper in question calls itself a ticket: "This ticket is valid only on the date written above, weather permitting." It refers to the consideration as a fare: "Fare paid $164.50." There is no mention of charter, chartering, or designation, or hiring of plane, or agreement that any particular plane be used. It speaks of the origin of the ticket, viz.: "Office of issue—Miami," language apt where a ticket is sold; inapt where a charter-party is made. It speaks of the ticket issuing company as a passenger carrier, viz.: "The undersigned * * * is familiar with and agrees to the terms and conditions under which this company carries passengers, as printed on the back of this ticket," thus evidencing the usual passenger-carrying operations of the company and its intent to create the same relation between it and the deceased as that existing in its usual passenger-carrying service. It contains a memorandum or evidence by which the ticket buyer can have the assurance and enjoyment of the right of passenger transport which he had paid for, viz.: "This ticket is valid only on the date written in above, weather permitting." To close the contract, which contract was prepared and furnished in print by the defendant, it causes the buyer thereof to sign in the relation of passenger, viz.: "C. William Glose," over the printed words, "Passenger's signature." It requires him to give up the ticket: "This ticket to be surrendered upon entering the plane," a practice common in passenger carrying service, and, on surrender, gives him a coupon showing payment for the carrying service, viz.: "This identification coupon to be retained by passenger during flight.".

As further evidencing the carrier-passenger relationship, we cite from the "Terms and

Conditions," referred to. We simply note, but without comment, the following which are compatible with a passenger-carrying service, but not with a charter, viz.: "The Company reserves the right to cancel, at any time, the entire flight or any portion thereof, and shall be under no obligation with respect to such cancellation except to refund the part of the fare paid equal to the unused portion of this ticket." In clause 4 we note: "Tickets not used for the time or date shown, for any reason (other than the cancellation of flight by the Company) will be considered as cancelled by the passenger and the fare paid will be retained by the Company if the space reserved remains unsold." We note also clause 5: "It is agreed between the holder of this ticket and the Company, that the same is a personal license, revocable at the will of the Company, with or without cause, and the holder's remedy in such event is limited to the repayment of the amount paid therefor and marked thereon"; and clause 6, which reads: "The holder agrees to observe the rules and regulations of the Company covering flights, and to obey the instructions of its agents and employees."

Without citing other reasons, it is clear that the contract between the deceased and defendant was not a charter of a plane.

■ Turning to the next question: Was there evidence from which the jury could infer negligence on defendant's part? We here disclaim our ability to discuss the question of the proper mode of operating a plane, but limit ourselves to a reference to testimony we regard as bearing on that problem. That the plane was in good order, supplied with proper equipment, fuel, etc., is clear. The mishap, therefore, cannot be attributed to any equipment cause, but rather to an operative one. Was there evidence of lack of due conduct on the pilot's part? There was proof that at the time of the mishap another plane was making the same trip, and its pilot could see defendant's plane. Near the place of the accident, a fog arose, but the witness, veering somewhat to the right, continued to Tampa, and arrived there in safety. When last seen, defendant's plane was continuing on the direct course to Tampa, and in so doing it would pass over the Phosphoric Company's plant. There was testimony that it would have been good flying to have turned back if the fog closed in too heavily. Evidently, for some reason, defendant's pilot decided to land at this plant. Such landing field was a small one, having as its surroundings a large river, a number of factories, a high administration building, railway switches, high-tension lines, poles, and surrounded on two sides by roads. The field was transversed in the shape of a T by ditches six feet wide and three deep. There was testimony given by plaintiff that, while a plane could land in it, it was probably too small to get out of, and a witness of defendant describes it as a field where "an experienced pilot, in 90 times out of 100 could have made a good landing." The proof was that within fifty miles there were several approved fields the pilot could have used. There also was testimony tending to show that in approaching the landing defendant's pilot did not keep the straight course of a thousand feet, but made several turns, and got well below the five hundred feet of altitude provided, where passengers are carried, by the regulations of the Commerce Department. Without entering into a discussion of the conflicting testimony as to banking and other operative questions, we are clear, in view of the testimony we have cited, that the court would have erred had it declined to submit the question of defendant's negligence to the jury.

■■ This brings us to the third question, as to whether, when the defendant's negligence caused the death of the deceased, defendant is not answerable in money damages above the sum stipulated in the ticket. The latter provided "that in the event of the injury or death of the holder due to any cause for which the Company is legally liable, the Company's liability is limited to $10,000." Is this limit of liability by the defendant for its legal liability valid? Now the policy of law is settled that common carriers, in dealing with passengers, cannot compel them to so release their legal liability for their own negligence. Bank of Kentucky v. Adams Exp. Co., 93 U. S. 174, 23 L. Ed. 872; Kansas City Southern R. Co. v. United States, 282 U. S. 760, 51 S. Ct. 304, 75 L. Ed. 684; Delaware, L. & W. R. Co. v. Ashley (C. C. A.) 67 F. 209. Such being the settled law, why should it not be applied to airplane passenger service? What reason is there why the same principles applicable to land and water should not also be applied to air transportation? Terminal Taxicab Co. v. Kutz, 241 U. S. 252, 36 S. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765. All alike perform the same service, viz., transportation. They are competitors for the same class of business. Every passenger carried by airplane means a passenger less for the railroad or the steamship. Transportation, as its derivation denotes, is a carrying across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result. Since, then, the three stand as, in substance, the

same, it remains to inquire whether the defendant was a common carrier, for, if it is, its attempted limitation of an injured passenger to recover full compensation for loss due to its negligence is invalid. While the charter of the defendant is not before us, the fact that it received a charter from the state is shown, and we are therefore warranted in regarding the things it did were done pursuant to the provisions of its charter. What did it do? It held itself out to the public as performing the things done by a common carrier. It solicited the patronage of the traveling public. It advertised schedules for routes, times of leaving, rates of fare. It established general rules and regulations. It published schedules which stipulated what baggage the passenger might carry, and added the usual condition for passenger-carrying service, that excess baggage would be charged for at published rates. It will thus be seen that, in all its approach to the public and in its rendering service to the public, defendant did precisely what railway and steamship lines do, and it sets the stamp of its common carrier character by coming in competition with rail and steamship lines. And in that connection it is to be noted that the railroads have regarded airplanes as doing a service identical with their own by providing a joint service of rail and air in long-distance travel. Regarding defendant as in fact a "common carrier," the trial court committed no error (as also, as well as in other particulars) in holding it liable for damages in excess of $10,000. Accordingly, the judgment is affirmed.