MIGUEL FIRPI, Plaintiff and Appellee, *v.* PAN AMERICAN WORLD AIRWAYS, INC., Defendant and Appellant.

No. 359. Decided October 9, 1963.

196

*Hartzell, Fernández & Novas,* and *Vicente M. Ydrach* for appellant. *Francisco Fernández Cuyar* for appellee.

—O—

*Hartzell, Fernández & Novas,* and *Vicente M. Ydrach* for appellant. *F. Fernández Cuyar* for appellee. *Ponsa Feliú, Calderón & Souss,* and *Wilson F. Colberg* for Eastern Air Lines and Caribbean Atlantic Air Lines, Inc., respectively, as amici curiae.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

This is a claim filed against an air carrier for the loss of certain jewelry in a flight between San Juan and New York on September 13, 1958. The defendant was ordered to pay to the plaintiff the sum of $9,625.00, costs and $1,000.00 for attorney's fees.

The main issue involved herein is whether the provisions of the Passenger Rules Tariff No. RR-3 of the Pan American World Airways, Inc.,[1] approved by the Civil Aeronautics Board should be applied to the facts proved.

After a trial on the merits the court made the following findings of fact:

Mr. Miguel Firpi and his wife executed a transportation contract with Pan American by virtue of which the latter

---

[1] Hereinafter designated as Pan American.

was bound to transport the former by airplane, together with their baggage, directly from San Juan to New York, for the price of $357.00.

To obtain proper transportation pursuant to the aforesaid contract, the plaintiff delivered and placed under the control of the defendant the baggage which consisted of five suitcases. In exchange, the defendant delivered to the plaintiff the tags corresponding to each bag in order that plaintiff could claim them in New York.

Mr. and Mrs. Firpi left San Juan on Flight 202 in the morning of September 13, 1958 and arrived at New York that same day in the afternoon. One of the five suitcases delivered, belonging to plaintiff's wife and containing her clothes, other objects and jewelry worth $9,625.00, was not returned when they presented the corresponding tag, although they did receive the other four pieces.

Plaintiff immediately went to defendant's office at the Idlewild Airport in New York and reported the nondelivery of the suitcase. They asked him to wait for the other flights from Puerto Rico to arrive because perhaps it would come in on one of them. They waited for the next flight with no success. Since it was late, they went to the Essex House where they had reserved rooms, left their baggage and returned to Idlewild. They went to the lost and found department of the airport and spoke to Mr. Lancey, head of the department, and informed him that the bag contained jewelry and articles worth from ten to fifteen thousand dollars and that it had to be found.

Again they went through the baggage that had come in other planes from Puerto Rico without being able to find the piece in question. From there they again went to the "Lost and Found" office but since it was 11:30 p.m. it was closed. They then made an international call to their son in San Juan and explained to him what had happened so that

he could relay it to Pan American offices at San Juan, which he did.

Next day (September 14, 1958) early in the morning plaintiff called Idlewild Airport and was told that the bag had not been found. Then he went to the General Motors' offices in New York, spoke to the attorneys of said company and from there they called Pan American offices at the Idlewild Airport urging them to find the bag.

In the meantime, Pan American had sent a teletype message to all its offices and departments in New York, Baltimore, Philadelphia, Boston, Washington, Miami, Antigua, St. Croix, Port of Spain, Yorktown, Paramaribo, etc., giving them a description of the bag, the tag number, the name of the passenger, the color of the cover and that it was extremely valuable, and to immediately inform Idlewild if found "since it had been misloaded and to return it to said Airport."

The message sent at 9:45 p.m. on September 13 was answered by defendant's traffic manager in Baltimore on September 14, 1958, at 6:50 p.m. informing the lost and found office in San Juan and in Idlewild that the bag of passenger Miguel Firpi had been erroneously sent to Baltimore on Flight 214 on September 13 and placed on board the flight to Idlewild with a stop at Philadelphia; that it should already be at Idlewild. He further informed that the baggage tag was marked "Flight 202" but with no destination shown.

On Monday September 15, at 5:50 p.m., defendant's traffic manager in Baltimore, in answer to a telegram addressed to him on that same day at 9:10 a.m. in connection with Flight 214 of September 13, and the bag of Mr. Firpi "informed that it had been definitely on board said flight of the 13th and to ask Philadelphia the reasons for their ground crew handling the bag although it may have been

pulled in error since bag was mistagged" and that the bag was last seen in Philadelphia and they alone can advise of their handling.

On Tuesday, September 16, 1958, plaintiff spoke to Mr. William H. Pace, Jr., general manager of Pan American in New York, who upon learning of what happened and of the contents of the suitcase, telephoned Mr. C. L. D'Gabriel to take charge of the case. Mr. D'Gabriel promised them to do everything in his power to find the suitcase.

On Wednesday morning September 17 plaintiff and his wife received a telephone call from the lost and found office of Idlewild in New York telling them that they were happy to inform them that the bag had been found in Baltimore and that it was being sent in the next flight to New York. Plaintiff answered not to send the bag to the hotel, to leave it at Idlewild as they would immediately come to pick it up, which they rapidly did.

When they arrived at the Idlewild Airport the bag was not delivered to them because it had not been received despite the fact that it had been found in Baltimore and seen for the last time in Philadelphia. It was put on board the flight to Idlewild and it was lost again en route without ever appearing again and lost forever to the passenger with all its contents.

Besides the clothing and other belongings the lost suitcase contained the following jewelry:

| | |
|---|---:|
| Diamond ring containing 1 diamond weighing approximately 4 cts. | $4,000.00 |
| Diamond baguette ring | 500.00 |
| Emerald and baguette diamond ring | 400.00 |
| Ruby and baguette diamond ring | 375.00 |
| 14 K. gold bracelet with pearls and diamonds | 500.00 |
| 14 K. gold pin and earrings to match | 150.00 |
| 14 K. gold Movado watch and attachment | 250.00 |
| Double strand of fine cultured pearls with diamond snap | 1,500.00 |

Diamond and pearl earrings to match necklace ........ 600.00

14 K. gold vacheron and constanting watch with gold
wrist band (new) ..................................................... 800.00

1 double strand cultured pearls necklace with dia-
mond clasp ................................................................. 300.00

1 platinum Madonna medal relief surrounded by
genuine pearls and diamonds with chain brought
from Spain ................................................................. 250.00

Total .......................................................... $9,625.00

The first conclusions of law clearly set forth the legal principles which the trial court considered applicable to the question. They are as follows:

"The action is predicated on the provisions of §§ 1802 and 1803[2] of the Civil Code of Puerto Rico which prescribe that a

[2] We believe that the appropriate legal provision governing the action filed herein is § 1054 of our Civil Code which provides:

"Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby."

We believe that §§ 273, 277 and 280 of the Code of Commerce are, by analogy, applicable. They provide:

"Section 273. The liability of the carrier shall begin from the moment he receives the merchandise, in person or through a person intrusted thereto in the place indicated for their reception."

"Section 277. If there should be an agreement between the shipper and the carrier with regard to the road over which the transportation is to be made, the carrier cannot change the route, unless obliged to do so by *force majeure*; and should he do so without being forced to, he shall be liable for any damage which may be suffered by the goods transported for any cause whatsoever, besides being required to pay the amount which may have been stipulated for such a case.

"When on account of *force majeure* the carrier is obliged to take another route, causing an increase in the transportation charges, he shall be reimbursed for such increase after presenting the formal proof thereof."

"Section 280. The carrier, however, shall be liable for the losses and damages arising from the causes mentioned in the foregoing section if it is proved that they occurred on account of his negligence or because he did not take the precautions usually adopted by careful persons, unless the shipper committed fraud in the bill of lading, stating that the goods were of a class or quality different from what they really were.

". . . . . . . .""

person who by an act or omission causes damage to another, when there is fault or negligence, is obliged to repair the damage done; not only for personal acts or omissions but for those of the persons for whom they should be responsible.

"In the case at bar the defendant contracted for the transportation of plaintiff and his wife and of their baggage from the city of San Juan to New York, for a specific sum of money and on the same plane. Insofar as the baggage in question is concerned the defendant did not comply with said contract. Instead of carrying it all to the city of New York, it put part in a different plane from the one in which plaintiff and his wife were travelling and sent it to Baltimore from where it was sent to Philadelphia. Defendant itself admits in its Answer to the complaint that 'for reasons which it ignores' Mr. Firpi's bag was taken to Baltimore instead of to New York and that when it was received in Baltimore it was sent to Philadelphia by defendant itself 'for reasons which it also ignores', notwithstanding the fact that at that time it had full knowledge that said bag contained valuable jewelry.

"Even assuming the validity of the clauses which limit to a certain sum the civil responsibility of the airways company in case of loss of baggage, if the carrier violates said contract by sending the baggage to a different point or city from the one contracted for with the passenger, certainly it cannot in all fairness invoke the provisions limiting liability of the very contract it has violated as a defense against the loss suffered by the passenger and which loss has been precisely caused by the carrier's nonperformance. It is almost a universal rule that when a party violates its contract it cannot invoke it to any effect or purpose. Defendant's failure to comply with its contract by sending the suitcase in another plane and to other cities not stipulated in the contract caused the provisions thereof to cease operating or having any legal effect in favor of defendant.

"It has been uniform and repeatedly held by the courts that when the carrier does not comply with the terms of the transportation contract it is liable for all the damages arising from said nonperformance, and it cannot invoke or resort to those clauses of said contract which it violated and which limited the amount of its liability, it being likewise held that the delivery of goods or baggage to different points, or by routes or means different from those stipulated in the contract, essentially af-

fects the transportation contract and deprives the carrier of the benefit of the clauses limiting liability to a certain amount. See: *Calderón* v. *Atlas Steamship Co.*, 64 Fed. 874, 875, *affirmed* in 170 U.S. 272, 42 L.Ed. 1033; *The Sarnia*, 278 Fed. 459, 461–463; *Sheldon Coast Co.* v. *Yukon Ind. Transport Co.*, 155 Fed. 29; *St. Johns, etc. Shipping Co.* v. *Compañía General*, 263 U.S. 119, 68 L.Ed. 201; *Smith* v. *U.S. Shipping Board*, 26 F.2d 337, 338–339, and 4 Elliot, Railroads, § 1656."

Appellant assigns the commission of six errors. In the first two assignments it maintains that certain conclusions of fact are contrary to the evidence; in the third, that the court erred in not setting forth a specific conclusion; in the fourth that it should have applied the aforesaid tariff to the facts proved; in the fifth that the judgment is contrary to law and in the sixth that the award of attorney's fees was improper.

We only consider meritorious for the purpose of its lengthy consideration, in view of the attendant circumstances in the appeal, the fourth and fifth assignments. The others either lack importance or are irrelevant, as we shall indicate at the end of this opinion.

In the light of the terms of the debate and the arguments of the parties, the question has been reduced to determining whether there was a deviation in the transportation contract and whether it deprives Pan American of invoking the tariff which exonerates it from all liability for the loss of the jewelry transported in its planes.

■ We do not deny that federal legislation which regulates interstate air commerce and the rates, rules and regulations promulgated under said legislation form part of the contract between the shipper and the carrier who contract for the air transportation of passengers or property between Puerto Rico and the United States. The Civil Aeronautics Act in defining "interstate air transportation" includes the transportation between a place in any state of

the United States, or the District of Columbia, and any point in a territory or possession of the United States. 49 U.S.C.A. § 1301(21). It expressly provided that: "Where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, references in this chapter to possessions of the United States shall be treated as also referring to the Commonwealth of Puerto Rico." 49 U.S.C.A. § 1301(29). Likewise Puerto Rico was included within the definition of "interstate air commerce" as provided in § 1301(20) of the same title.

The Civil Aeronautics Act requires every carrier to file with the Civil Aeronautics Board, and keep open to public inspection, tariffs showing all rates, charges and, to the extent required by the regulations of the Board, all classification, rules, regulations, practices and services in connection with such transportation. 49 U.S.C.A. § 1373.

■ It was pursuant to said section of the Act that Pan American filed with the Civil Aeronautics Board Tariff RR-3 which it now invokes. The provisions or declarations contained in said tariffs, duly filed and approved by the Board, constitute part of the transportation contract and they are valid and binding on the contracting parties irrespective of the actual knowledge thereof that a passenger or shipper may have. 29-1 The Journal of Air Law and Commerce 1–88, *Tariff Limitations* 21 (Winter 1963). In *Lichten* v. *Eastern Airlines*, 189 F.2d 939 (1951), it was said that under the doctrine of "primary jurisdiction" the determination as to the reasonableness of the tariff rested primarily with the corresponding administrative agency and that the provisions of a tariff duly filed with the Board and under its authority were considered valid until revoked by the Board.

■ Among the provisions included in the transportation contract in question, Rule 18 of Tariff RR-3, filed and approved by the Civil Aeronautics Board, contains a clause

by virtue of which Pan American is relieved from liability in transporting a certain kind of baggage. Rule 18(H) reads:

"Carrier is not liable for loss, damage to or delay in the delivery of fragile or perishable articles, money, jewelry, silverware, negotiable papers, securities or other valuables, business documents, or samples which are included in the passenger's checked baggage, whether with or without the knowledge of the carrier."

When the checked baggage contains other articles not mentioned in Rule 18(H), it is provided by Rule 18(E) that the carrier's liability is limited to $16.50 or its equivalent per kilogram, unless a higher value is declared in advance and additional charges are paid pursuant to carrier's tariff. In that event the liability of the carrier shall be limited to the value declared. It is further provided that in no case shall the carrier's liability exceed the actual loss suffered by the passenger.

The validity of the tariff provisions limiting liability like the one cited above has been consistently upheld by American courts in deciding cases concerning interstate transportation. 9 Am. Jur. 664; *Randolph* v. *American Airlines*, 144 N.E.2d 878 (1956); *Vogelsang* v. *Delta Airlines*, 302 F.2d 709 (1962). However, for a carrier to be entitled to invoke the benefits of the contractual provisions it is necessary and fundamental that it must have complied with those terms and conditions which directly go to the essence of the transaction carried on. *McKahan* v. *American Express Company*, 35 L.R.A. 1046 (1911), and other cases cited therein.

An unjustifiable deviation by a public carrier from the route stipulated in the contract violates the terms of the contract. Such an action deprives him of invoking the provisions of the contract which favor him. *Ward* v. *Gulf M. & N. R. Co.*, 134 S.W.2d 917, 922 (1938). Consequently, it is estopped, under those circumstances, from invoking a

stipulation exempting liability. 9 Am. Jur., *Carriers*, 707, 708, § 476.

■ Pan American was bound to transport Mr. Firpi and his wife together with their baggage directly from San Juan to New York. Yet, the suitcase, the loss of which has given rise to this action, was placed and forwarded in a different plane and on a different route from that in which appellee and his wife were travelling. No evidence whatsoever has been offered to justify this action on the part of the appellant. This conduct represents a substantial departure or deviation from the manner in which the contract, by previous agreement, was to be executed. Part of the baggage in question was subjected to a greater risk than what the parties had in mind at the time of executing the contract. *Carriers-Deviation*, 33 A.L.R.2d 155, 156, 217, 222.

In support of its contention that there was no deviation appellant cites Rule 9(b) of Tariff RR-3 which refers to "Movement of Baggage". Said Rule provides:

"Checked baggage *will be carried in the same aircraft as the passenger unless such carriage is deemed impractical by Carrier,* in which event Carrier will move the baggage on the next preceding or subsequent flight on which space is available." (Italics ours.)

It argues that since the tariff grants, under said rule, the right to send the baggage in the next subsequent flight on which space is available, the carrier did not violate the transportation contract by sending the bag on the next flight. We cannot assent to that. In construing Rule 9(b) we cannot conclude that it means an implied waiver by the passenger of the right granted to him *under the same contract* to have his baggage forwarded *on the route contracted for.* We should always construe that clause in harmony with the manifest intention of the parties at the time of its execution. Pan American was bound to transport the baggage directly from San Juan to New York. It so accepted it in its Answer

when it admitted the allegations contained in the first paragraph of the complaint. The evidence did not show that there was any agreement to the contrary or the impossibility of its performance.

Rule 9 (b) in granting to the carrier the right to forward the baggage on the subsequent flight, does so taking for granted that it shall use the route originally agreed upon, pursuant to its first part which provides: "Checked baggage will be carried in the same aircraft as the passenger."

We have pointed out that the trial court concluded that since Pan American had deviated from the contract it could not at the same time invoke the provisions which relieved it from liability and that if the loss had taken place in the straight route from San Juan to New York, as contemplated in the transportation contract, defendant would not have been precluded from invoking them. Its conclusion was correct.

In *Ward* v. *Gulf, supra*, an analogous situation to the one at bar was painstakingly considered. It involved a federal legislation which regulated rail transportation. We copy a pertinent portion of the opinion from page 928:

"In the instant case, in agreeing that the released values specified in the contract and provided for in the published tariffs should form the basis of the defendants' liability in the manner provided for in the event of loss or damage, we think what the parties meant and the framers of the tariff intended, was that the basis thus fixed should govern with respect to loss or damage resulting from risks *incident* to transportation and delivery by the service agreed upon, . . . *it was never contemplated that that provision had any reference to loss or damage to the property as a result of being subjected to the greater hazards and vicissitudes of a radically different type of service.*" (Italics ours.)

In that *Ward* case, the defendant argued that since the agreement limiting the liability for the benefit of the carrier had been fixed in consideration of the reduced rate charged,

it became a part of the rate published and to hold carrier to a greater responsibility would be an unlawful discrimination against those electing to pay a higher rate for the same service but without the agreement limiting liability. The trial court answered defendant's contention thus (p. 927):

". . . the argument . . . overlooks the fact that the defendants did not render the service for which plaintiff paid and which was as much a part of the published rate as was the agreement limiting liability. The contract to furnish a special type of service was, we think, *no less a consideration for the limiting agreement than was the reduction in the rate*; for it is readily understood how a shipper would consent to a limitation on the liability of a carrier, believing that his property would be transported by a special and relatively safe means, but would not do so if the type of service to be furnished involved a substantially greater risk of loss or damage.

" . . . . . . . .

" '. . . the rule of equality is in force only where the service performed in the different cases is substantially the same and the circumstances and conditions are similar.' (9 Am. Jur. 558, sec. 205.)

"It is plausible, at least theoretically, that in such a case the increased responsibility to which the carrier is held would be justified by the advantage presumably accruing to it by reason of the substitution of a type of service different from that it agreed to render; that the inequality in the rates charged one who did and another who did not make an agreement with respect to the value of the property, would be counterbalanced by the inequality in the respective types of service rendered.

"We think the rule contended for by the defendants, if applied to factual situations such as that before us, instead of preventing unlawful discriminations, would sanction them; for under it, as above pointed out, a carrier could at its election furnish one patron with special service forming the basis for a rate and to another paying the same charge and complying with the same requirements a different and inferior type of service. . . ." (Italics ours.)

In *The Sarnia* case, 278 Fed. 459 (1921), the bill of lading provided that the goods to be shipped were to be

carried under deck. A clause in the contract limited the carrier's liability to $100 per package. The goods were carried on deck and as a result suffered damages in the course of a heavy storm. The court found that by such conduct the carrier grossly violated the contract and was deprived of invoking the clause in its benefit. We copy from page 463:

". . . *for the shipper, in fixing the amount in such a clause, takes under consideration the risk to which his goods are to be exposed and the manner of their carriage.* The fact that the goods are to be carried below deck is understood between the parties, and is as much a part of the valuation clause as it is of any other of the clauses in the bill of lading. . . . In fixing the value the shipper was undoubtedly influenced by the fact that the goods were to be carried below deck, and not exposed to the perils of carriage above deck." (Italics ours.)

In *American Railway Co.* v. *Levee*, 263 U.S. 19, 21 (1923), which dealt with a clause limiting liability pursuant to some tariffs approved by the Interstate Commerce Commission, the court said in part:

". . . Under the law of the United States governing interstate commerce the stipulation constituted a defense to liability beyond fifty dollars, *unless the plaintiff should prove some facts that took the case out of the protection of the contract. . . .*" (Italics ours.)

Appellant insistently cites the ruling in *Lichten* v. *Eastern Airlines, supra.* In that case the plaintiff contracted for air transportation for herself and baggage from Miami, Florida, to Philadelphia, Pa. Of the two pieces included in her baggage only one was delivered to her when she arrived at Philadelphia; the other suitcase was mistakenly left in the plane which continued to Newark, New Jersey. In New Jersey it was delivered to an unknown person. Although it was later returned to her, Lichten filed action alleging that when the suitcase was delivered to her certain jewelry was missing worth $3,187.95. A clause in the contract provided that jew-

elry, among other things, would be transported at the risk of the passenger.

We agree with the trial court that the *Lichten* case ratifies the general doctrine that a deviation in the contract deprives the carrier of the benefit of the provisions limiting liability. Notwithstanding its recognition of that doctrine it held that it is not applicable to the facts proved in that case.

A careful reading of the *Lichten* case will show that the language used gives the idea that not every deviation in the contract should nullify the provision limiting liability. The court held that there was a deviation but that it was not sufficient to deprive the carrier of invoking the exculpatory provisions. That conclusion is not contrary to the principles we have discussed; it merely shows the difficulty often encountered by the judge in trying to determine what constitutes a deviation estopping the carrier from invoking the exculpatory provisions. What in one case may prove to be a deviation estopping the carrier from invoking the provisions of the contract in his favor, may not be so in another case. "The propriety of any particular deviation is a question of fact in each case and there is no fixed rule for such determination." 33 A.L.R.2d 159.

The facts in the *Lichten* case make it entirely distinguishable from the present case and in all probability they weighed heavily in the final determination of the court. The distinction rests in that in the *Lichten* case there was a question of over-carriage beyond the point of destination, while the case at bar involves the substitution of the route contracted for.

We believe that the present case, unlike the over-carriage question in the *Lichten* case, shows such a degree of non-performance, pursuant to the terms of the contract, that it calls for a different treatment.

There is no doubt that in the *Lichten* case the performance of the contract was substantially executed. All the bag-

gage, as well as plaintiff herself, had reached their point of destination. Up to that instant the company had substantially complied with the contract. It was thereafter that the deviation occurred, but not to such an extent as to indicate that the court should decide that the carrier was deprived of invoking the provisions in the contract that are in his favor.

From the facts proved in the case at bar it cannot be said that a substantial performance took place. With respect to the fifth suitcase—never found—there was no performance of contract. From the very beginning of its execution a deviation took place which entailed a substantial patrimonial loss for its owners. Nothing is changed in what has been said before because of the fact that the contract was performed with respect to the appellee and the rest of his baggage. The obligation provided by direct transportation is binding for *all* the baggage. In the *Lichten* case, before the deviation took place, *all* the baggage had reached its destination.

In *McKahan* v. *American Express Co.*, *supra*, the court expressed itself in the following terms at pp. 1051, 1052, 1053:

"It is settled as matter of authority that a deviation by a carrier from the route described in a contract of shipment makes him liable as an insurer of the goods shipped, although the contract of shipment exempts him from liability under the circumstances (apart from the deviation) under which the goods were lost or damaged.

". . . the same is true where there has been a departure from the method (including mode and manner) of transportation agreed upon. . . .

"In the case at bar the shipper's agreement that the horses were to be valued at $75 each was plainly based *upon the risks incident to the transportation agreed upon*, . . ." (Italics ours.)

In *Oliver Straw Goods Corp.* v. *Osaka Shosen Kaisha*, 47 F.2d 878, 880, it was said:

"In other words, the limitation clauses applied only to cases where the damage was due to losses encountered *during the performance of the contract. . . ."* (Italics ours.)

The trial court in deciding that the deviation of the essential terms of the contract on the part of the carrier deprived it of the benefit of the provisions stipulated in its favor, cites in support thereof a line of cases, among them *McKahan* v. *American Express Co.,* to which we have already referred. Appellant argues that none of the cases cited by the trial court involves air transportation but marine and land transportation. No persuasive reason has been advanced to prevent the principle laid down in those cases from being applied, by analogy, to cases of air transportation. Marine and land transportation, unquestionably, partake of certain characteristics and conditions which are common to air transportation. They all have one common goal: carriage of persons and property between different points. It cannot be accurately affirmed that the risks in one case are inherently greater than in the other. Nor can we overlook the rapid and tremendous development that air transportation has undergone in recent years, bringing it to a level of competition, against the other two, that rises way above that existing a few years ago.

*Curtiss-Wright Flying Service* v. *Glose,* 66 F.2d 710, 712, although it dealt with interstate air transportation, presents a situation very similar to the case at bar: the alleged negligence in the operation of the plane in question caused the death of plaintiff's husband. There was a clause limiting the liability of the company up to a maximum of $10,000 even in case of its own negligence. The court in allowing a compensation in excess of the aforesaid amount, stated:

". . . Now the policy of law is settled that common carriers, in dealing with passengers, cannot compel them to so release their legal liability for their own negligence. . . . Such being the settled law, why should it not be applied to airplane pas-

senger service? What reason is there why the same principles applicable to land and water should not also be applied to air transportation? . . . All alike perform the same service, viz., transportation. They are competitors for the same class of business. Every passenger carried by airplane means a passenger less for the railroad or the steamship. Transportation, as its derivation denotes, is a carrying across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result. . . ."

McNair, The Law of the Air, 2d ed. by Kerr and Mac-Crindle, treating this same matter, says at p. 171:

"It remains to consider whether the analogy of sea and land carriage can be applied in considering the effect of deviation, . . . There seems no reason whatever why the same principles should not apply to a contract of carriage by air, . . ."

With respect to the *Lichten* case it states the following:

". . . their judgment can hardly be invoked against the contention that the concept of deviation applies to air carriage."

Indicating the scope of the concept "deviation" the court in *The Sarnia* case, *supra*, refers to the case of *The Indrapura*, 171 Fed. 929, 931, and says at p. 463:

". . . but it seems now to comprehend in general every conduct of a ship *or other vehicle used in commerce* tending to vary or increase the risk incident to a shipment." (Italics ours.)

To our minds, the foregoing shows that the fourth and fifth errors were not committed.

■ Although we believe that the first error was committed, it should not give way to a change in the judgment entered. When the defendant found the suitcase in Baltimore and forwarded it to New York it could not know the contents of said bag, inasmuch as it was not until 9:00 p.m. when for the first time Mr. Firpi informed New York about its contents. That fact, however, might perhaps have been significant if appellant had acted pursuant to the terms of the contract.

The second assignment, accepting that it was committed, would not constitute reversible error. The telegram to which the trial court refers is dated September 17, but, as appellant says, "it is inoperative at law that an employee of Pan American in Philadelphia or another employee in Baltimore or any other employee of any other terminal, might have had or not *personal* knowledge of the worth of the suitcase." Pan American, as an enterprise, obtained that knowledge from the very day Mr. Firpi reached New York and the fact that it delayed the message until September 17 helps it none.

■ The third assignment is that the trial court erred in failing to state a conclusion in the sense that on September 13, 1958, the day in which Mr. Firpi and his wife flew to New York, Pan American World Airways Passenger Tariff RR-3 was effective and filed with the Civil Aeronautics Commission. Said error was not committed. Rule 43.1 of the Rules of Civil Procedure of 1958 provides that every court should set forth the facts proved and state separately its conclusions of law. It has been said that the rule "is intended, among other things, to aid appellate courts by affording them a clear understanding of the basis of the decision below." *Meléndez* v. *Metro Taxicabs*, 68 P.R.R. 709, 712 (1948). Its main object is "to enable this Court to determine whether or not the findings of fact and conclusions of law were justified." *Santana* v. *García*, 71 P.R.R. 132 (1950); *Varela* v. *Fuentes*, 70 P.R.R. 838 (1950); *Santiago* v. *Martínez*, 72 P.R.R. 873, 875 (1951).

■■ Although the court whose decision we now revise, did not state separately the conclusion mentioned, it went into a lengthy discussion as to the effect of said tariff in connection with the particular facts before it. Among other things, it said that "if the suitcase had been lost en route from San Juan to New York, which was the route agreed upon by the parties, the defendant would have been liable

within the contract limit according to the *McKahan* case."
It even assumes the validity of the clauses limiting the lia-
bility in case of baggage loss. In its final conclusion it dis-
cards the same because it does not consider it applicable to
the case. From the whole discussion offered by the court,
we have clearly conceived the basis of its decision. As cor-
rectly stated in *Meléndez* v. *Metro Taxicabs, supra*: "When
this clear understanding is afforded, the judgment may stand
although the Rule is violated." Thus, bearing in mind the
particular facts of the present case, we decide that the sub-
stantial compliance with Rule 43.1 meets the requirements
of the law. It is necessary, however, that we point out that
ordinarily a substantial compliance with Rule 43.1 does not
constitute the compliance ordered therein. It requires a full
and complete observance. We have given this warning pre-
viously. See in this respect the cases cited and others men-
tioned therein. Only in exceptional cases should substantial
compliance be upheld.

There is nothing in the record to compel us to disturb
the award of attorney's fees.

 Before closing let us turn briefly to the question
of "primary jurisdiction" raised by appellant. It maintains
that to allow the conclusion of the trial court to stand is
tantamount to deciding that Tariff Rule 9 (b) which author-
izes the forwarding of baggage in a subsequent flight is
unreasonable, and in such case it would be incumbent on
the Board to make such a determination. We do not agree.
We agree with appellant that under the "primary jurisdic-
tion" doctrine an attack against the reasonableness of the
tariff filed in the Civil Aeronautics Board should first be
made before said administrative agency. *Furrow & Co.* v.
*American Airlines*, 102 F.Supp. 808, 809 (1952); *Lichten*
v. *Eastern Airlines, supra*. This principle is a sequel of an-
other principle which requires that where the question de-

mands the exercise of administrative discretion requiring special knowledge and experience, it is incumbent on the administrative agency, having that knowledge and experience, to exercise its discretion. *CAB* v. *Modern Air Transport*, 179 F.2d 622, 624 (1950). However, this is not a question of reasonableness, as appellant claims, but rather one of determining the scope of the application of Rule 9(b) of the Tariff which was before the trial court. In sending the baggage through a route other than the one stipulated the appellant acted in a manner not authorized by said rule. In *Jones* v. *Northwest Airlines*, 157 P.2d 728, 729 (1945), the court agreed with *Adler* v. *Chicago & Southern Airlines*, 41 F.Supp. 366, 367, in that when the reasonableness or lawfulness of a practice regulated by the Civil Aeronautics Act is attacked, the determination falls within the competence of the Civil Aeronautics Board only and in the absence of such finding, the court has no jurisdiction over the matter. Yet, it adds:

"Where, however, the carrier has breached its contract of carriage by violating its own or interstate commerce commission rates, rules, regulations, or procedure, it is not necessary to refer the matter to the interstate commerce commission, because *there is no technical fact to be determined.*" (Italics ours.)

See, also, The Journal of Air Law and Commerce, *supra*, pp. 23–25.

In the case at bar no attempt has been made to challenge the reasonableness or lawfulness of the Pan American Tariffs filed with the Civil Aeronautics Board. Like in *Jones* v. *Northwest Airlines, supra*, this is a case of breach of contract. That is strictly a conclusion of law which does not require the aid of a group of persons with special knowledge and experience necessary to deal with technical facts. And since appellant cannot invoke the transportation con-

tract executed pursuant to the tariffs filed, we are of the opinion that a previous finding by the Board was not necessary to grant the relief sought.

The judgment appealed from will be affirmed.

—O—

ON RECONSIDERATION

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court, on reconsideration.

San Juan, Puerto Rico, March 8, 1967

On October 9, 1963 we affirmed the judgment of the Superior Court of Puerto Rico, San Juan Part, of June 16, 1960, granting $9,625 as compensation for the loss of certain jewels contained in a lost suitcase and $1,000 for attorney's fees.

The main issue involved in the previous opinion was the following: Pan American undertook to transport Mr. Firpi and his wife with their baggage directly from San Juan to New York. No special declaration of value for any piece of baggage was made; but the suitcase, the loss of which has given rise to this action, was placed and forwarded in a different plane and on a different route from that in which Mr. Firpi and his wife were traveling. No evidence whatsoever was offered to justify such action of Pan American. This conduct represents a substantial departure or *deviation* from the agreement in the transportation contract.

As it is well explained in the previous opinion, every transportation contract is governed by Rule 18 of the Passenger Rules Tariff No. RR-3 filed by the carrier and approved by the Civil Aeronautics Board, which provides:

"Rule 18—Limitation of Liability:

"Except as the convention or other applicable law may otherwise require, A—Carrier is not liable for any claim for damages of whatsoever nature arising out of or in connection with carriage or other services performed by carrier incidental thereto, unless such damage is proved to have been caused by the negligence or willful fault of carrier and there has been no contributory negligence of the passenger."

"E—(1) Any liability of carrier is limited to $16.50 (250 french gold francs) or its equivalent per kilogram in the case of checked baggage or other property, unless a higher value is declared in advance and additional charges are paid pursuant to carrier's tariff. In that event the liability of carrier shall be limited to such higher declared value. In no case shall the carrier's liability exceed the actual loss suffered by the passenger. All claims are subject to proof of amount of loss."

"Rule 18(H) Carrier is not liable for loss, damage to or delay in the delivery of fragile or perishable article, money, jewelry, silverware, negotiable papers, securities or other valuables, business documents, or samples which are included in the passenger's checked baggage, whether with or without the knowledge of the carrier."

The rule of law pointed out in the previous opinion, now on reconsideration, was the following: "The validity of the tariff provisions limiting liability like the one cited above has been consistently upheld by American courts in deciding cases concerning interstate transportation. . . . However, for a carrier to be entitled to invoke the benefits of the contractual provisions it is necessary and fundamental that it must have complied with those terms and conditions which directly go to the essence of the transaction carried on. . . . An unjustifiable deviation by a public carrier from the route stipulated in the contract violates the terms of the contract. Such an action deprives him of invoking the provisions of the contract which favor him. . . . Consequently, it is estopped, under those circumstances, from invoking a stipulation exempting liability."

■ The right of the carrier to deviate the baggage wholly or in part is acknowledged by Rule 9 (b) of the same tariff which provides: "Checked baggage will be carried in the same aircraft as the passenger unless such carriage is deemed impractical by carrier, in which event carrier will move the baggage on the next preceding or subsequent flight on which space is available." Judicial notice may be taken of the necessity to adjust the weight in air transportation according to the greatest security of the passengers, the crew, the baggage, and the cargo. Usually, the determination of the most advisable weight, according to the practicability in the airports, the atmospheric conditions, etc., is left to the experienced criterion or the technical knowledge of the carrier. As in the human bodies there is no fixed tonnage, and the size and weight of the suitcases is ruled more by vanity than by utility, air cargo is always subject to these adjustments of reduction.

Now then, a more extensive examination of the air transportation contract as a whole, according to the new arguments presented, has convinced us that in the previous opinion we overestimated the importance of the secondary question of "deviation" from the route and we failed to consider the mutual obligations of both parties in said contract. Perhaps the emphasis on "deviation" of the route was the result of applying the case law of another kind of transportation in which the risk of damage due to change of place—deck instead of the hold of a ship, in case of maritime transportation—or—increase in fungibility resulting from the longer duration of the land transportation—would create a series of problems which are not typical of air transportation.

Rule 9 (A) (2) of the same tariff, in relation to the declaration of air baggage, provides: "Upon delivery to Carrier of the baggage to be checked, Carrier will insert in the ticket the number of pieces and weight of the checked bag-

gage (which act shall constitute the issuance of the baggage check) ; in addition Carrier will issue for identification purposes only, a baggage (claim) tag for each piece of baggage so delivered and covered by the baggage check. All checked baggage must be properly packed in suitcases or similar containers in order to ensure safe carriage with ordinary care in handling. Fragile or perishable articles, money, jewelry, silverware, negotiable papers, securities or other valuables, business documents or samples, will not be accepted as checked baggage."

According to the carrier's tariff there are only two cases of baggage air transportation: (1) ordinary baggage declared by the number of pieces and the weight of each piece, and (2) special baggage declared by the value of the piece. In the first case, the liability for the loss of the ordinary piece is determined by the first stipulation of Rule 18-E(1), in the sense that, for ordinary baggage declared by the number of pieces and the weight of each piece only $16.50 per kilogram will be paid; in the second case the liability for the loss of the special suitcase is determined by the second stipulation of Rule 18-E(1) in the sense that baggage declared according to its value, the highest value declared will be paid, it being understood that in no case it shall exceed the actual loss, all passenger's claim against the carrier being subject to the proof of the amount of loss.

It is clear that when no special value of a particular suitcase is declared, and the carrier is not offered the opportunity to examine the contents of the suitcase, and to increase the price of the transportation in order to take such measures of special custody, additional insurance and direct delivery at the airport, as may be required by the special value of the cargo, the liability for the loss of the suitcase of special value will be the same as that of the ordinary piece at the rate of $16.50 per kilogram. Rule

18-H as well as Rule 9(A)(2) of the tariff clearly establish that the jewels will not be accepted as ordinary baggage (checked).

For the reasons stated, our judgment of October 9, 1963 will be reversed and the judgment appealed from rendered on June 16, 1960 by the Superior Court of Puerto Rico, San Juan Part, in civil case No. 58-6417, brought by *Miguel Firpi* v. *Pan American World Airways, Inc.*, will be set aside, and the case remanded to the court of first instance to render a new judgment granting appellee compensation according to Rule 18-E(1) of the tariff to which our preceding and last opinion of this date refers, with costs but without attorney's fees.